**Richard MEYER, as custodian for Pamela Meyer, Plaintiff-Appellant,**

v.

**OPPENHEIMER MANAGEMENT CORPORATION, Oppenheimer Asset Management Corporation, Oppenheimer. & Co., Oppenheimer Holdings, Inc., A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., Bateman Eichler, Hill Richards, Inc., J.C. Bradford & Co., Centennial Capital Corporation, and Daily Cash Accumulation Fund, Inc., Defendants-Appellees.**

**No. 920, Docket 84–7977.**

United States Court of Appeals, Second Circuit.

Argued April 1, 1985.

Decided May 30, 1985.

Van Graafeiland, Circuit Judge, concurred with opinion.

Mordecai Rosenfeld, New York City, for plaintiff-appellant.

Alfred Berman, New York City (Guggenheimer & Untermyer, Robert E. Smith, Alan I. Raylesberg, Jeffrey R. Zuckerman, New York City, of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

FEINBERG, Chief Judge:

Plaintiff Richard Meyer, as custodian for Pamela Meyer, appeals from an order of the United States District Court for the Southern District of New York, Abraham D. Sofaer, J., dismissing plaintiff's amended complaint against the Daily Cash Accumulation Fund, Inc. (the Fund), the Fund's investment adviser, Centennial Capital Corporation (Centennial), and various securities dealers that together owned all of the stock in Centennial (the brokerage defendants). The amended complaint challenges on several grounds the legality of a decision by the Fund to adopt a plan of distribution (the Plan), pursuant to Rule 12b–1, 17 C.F.R. § 270.12b–1 (1984), of the Securities and Exchange Commission (SEC). The Plan authorizes the Fund to reimburse securities dealers, including the brokerage defendants, for "administrative and sales related costs in rendering distribution assistance to the Fund." For the reasons stated below, we reverse the order dismiss-

ing the complaint and remand for further proceedings.

## I.

Taking plaintiff-appellant's allegations as true, as we must for the purpose of this appeal, *Wade v. Johnson Controls, Inc.*, 693 F.2d 19, 20 (2d Cir.1982), the relevant facts are as follows. Appellant is a shareholder of the Fund, a money market mutual fund regulated by the Investment Company Act of 1940 (ICA or the Act), 15 U.S.C. § 80a–1 *et seq.* The Fund's shares are sold largely through the facilities and efforts of five brokerage firms, defendants-appellees Oppenheimer Management Corporation, Thomson McKinnon Securities, Inc., A.G. Edwards & Sons, Inc., Bateman Eichler, Hill Richards, Inc., and J.C. Bradford & Co.

At all relevant times, these five firms, either directly or in one case through a wholly owned subsidiary, owned all of the stock in the Fund's investment adviser, Centennial. Oppenheimer Management Corporation owned all of the stock of defendant-appellee Oppenheimer Asset Management Corporation, which in turn owned a majority of the stock in Centennial. The other four brokerage firms owned the remainder of Centennial's stock. The remaining two defendants were also closely related to their co-defendants: Oppenheimer & Co. owned almost all of the stock of Oppenheimer Holdings, Inc., which in turn owned virtually all of the stock of Oppenheimer Management Corporation, one of the brokerage defendants.

Centennial provides the Fund with investment advisory services in exchange for a fee that prior to 1980 was set at one-half of one percent of the Fund's net assets. In 1980, the plaintiff-appellant in this suit filed an action against the Fund, the investment adviser (Centennial was then called THE Management Group), the Oppenheimer defendants, A.G. Edwards and Thomson McKinnon. That suit, *Meyer v. Oppenheimer Management Corp.*, 609 F.Supp. 380 (S.D.N.Y.1984) (*Meyer* I), alleged that the fee charged by the investment adviser

pursuant to its agreement with the Fund was excessive and therefore that the non-Fund defendants had violated section 36(b) of the ICA, 15 U.S.C. § 80a–35(b), which provides that an investment adviser of a mutual fund has a "fiduciary duty with respect to the receipt of compensation." *Meyer* I was settled in 1981 when the parties agreed to a reduction of the adviser's compensation so that the advisory fee rate, as a percentage of assets, decreases as the Fund's assets increase. In the Stipulation of Settlement, the parties also agreed that the new advisory fee could not be increased without court approval for five years, and that Centennial would "perform and offer to continue to perform all of the investment advisory services specified or required by the terms of the Advisory Agreement currently in effect between Centennial and the Fund." At the time, both sides acknowledged that the brokerage defendants, which owned Centennial, also performed significant services for the Fund without compensation. The settlement, however, nowhere expressly provided that the brokerage defendants must continue to perform these services.

Judge Sofaer approved the settlement in *Meyer I* in August 1981, concluding that the proposed settlement was "fair, reasonable and adequate." In the spring of 1982, the Fund proposed and its shareholders adopted a Rule 12b–1 plan of distribution, which authorized the Fund to reimburse the brokerage defendants, among others, for administrative and sales-related costs incurred in rendering distribution assistance to the Fund.

Shortly thereafter, the plaintiff in *Meyer I* filed the present action, in which he makes the following claims: (1) The Plan violates the *Meyer I* settlement by authorizing payment for services that were intended under the settlement to be covered by the advisory fee; (2) The Plan's administrative fee, when coupled with the settlement's advisory fee, violates sections 36(b) and 48 of the ICA, 15 U.S.C. §§ 80a–35(b), 80a–47(a), because it is excessive and therefore represents a breach of the non-Fund

defendants' fiduciary duty. According to the amended complaint, at the Fund's then current size the advisory fee fixed by the settlement would be approximately $18.5 million per year and the Plan's administrative fee would be approximately $10 million; (3) The Fund violated section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and section 20 of the ICA, 15 U.S.C. § 80a-20, because the proxy statement proposing the Plan failed to state that the advisory fee paid by the Fund to Centennial was intended to cover the expenses for which the Plan would reimburse brokers; (4) The sale of two of the Oppenheimer defendants, which resulted in a change in the control of Centennial, violated section 15(f) of the ICA, 15 U.S.C. § 80a-15(f), by placing an "unfair burden" on the Fund.

After appellant complied with the district court's ruling that he present his demand to the Fund's directors, and the board rejected the demand, the district court granted defendants-appellees' motion to dismiss under Fed.R.Civ.P. 12(b)(6). This appeal followed.

## II.

The overarching issue on this appeal is whether appellant's averments are sufficient to withstand appellees' motion to dismiss. Dismissal of a complaint for failure to state a claim is a "drastic step," *Johnson Controls, supra,* 693 F.2d at 22, which must not be taken "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). With this admonition in mind, we turn to consider appellant's claims.

### A. *Breach of Settlement Claim*

■ Appellant's first claim is that implementation of the Plan, under which securities dealers are reimbursed for costs incurred in rendering administrative assist-

ance to the Fund, deprived him of the benefits of the settlement in *Meyer I.* At the outset, appellees argue that this issue is not properly before us. They note that Judge Sofaer treated the breach of settlement claim as a motion to enforce the settlement in *Meyer I.* Because appellant failed to include explicit reference to *Meyer I* in his notice of appeal, appellees contend that we are without jurisdiction to consider this claim. Given our general practice of construing notices of appeal liberally, *see LeSportsac, Inc. v. K mart Corp.,* 754 F.2d 71, 80 (2d Cir.1985), the close connection between this claim and that based on section 36(b) of the ICA, *see* Section II B, *infra,* and appellees' failure to show that they were "misled by the mistake," *see LeSportsac, supra,* 754 F.2d at 80; 9 J. Moore, B. Ward & J. Lucas, *Moore's Federal Practice* ¶ 203.18, at 3–77 (2d ed. 1985), we conclude that this contention is without merit.

■ Judge Sofaer, interpreting the settlement agreement "within its four corners," *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), concluded that the services paid for under the Plan are not those that Centennial obligated itself to render under the settlement agreement. In doing so, he rejected appellant's argument that statements made by both sides in support of the settlement establish that the fee agreed to in the settlement was meant to include payment for the services now paid for under the Plan. As appellees emphasize, Judge Sofaer presided over the settlement hearing and approved the settlement in *Meyer I;* he is therefore in a particularly good position to interpret the agreement's terms. Nevertheless, we are persuaded by appellant's contention that discovery might reveal at least some overlap between the settlement's advisory services and the Plan's administrative services, and hence that the settlement was violated. Dismissal for failure to state a claim was not warranted.

■ Moreover, the approved settlement had two components: It specified what

Centennial is obligated to continue to do to earn its fee, and it determined that the fee is "fair." Even if the district court was correct in its interpretation of Centennial's obligations, it failed to focus on whether, in light of the Plan, the fee set by the settlement remains "fair." The fairness of the $18.5 million fee was asserted by the owners of Centennial partly on the ground that the Fund was being spared certain expenses. In particular, their memorandum to the district court in support of the proposed settlement stated:

> Centennial also *provides* a number of services to the Fund not normally provided by investment advisers. Chief among these services are the enormous shareholder servicing and transfer agency operations performed *at cost* by SSI. In addition, defendants Edwards and Thomson, whose customers represent approximately 80% of the Fund's beneficial shareholders, administer their own customers' accounts at a total savings to the Fund of between $2 million and $3 million per year.... Brokerage firms such as Edwards and Thomson also save the Fund "in excess of probably $50,000 a month in postage alone" by incorporating the Fund's monthly dividend statements in the account statements mailed to their own customers who own shares in the Fund. (emphasis added in part).

SSI, referred to above, is a wholly owned subsidiary of the Oppenheimer companies. That the defendants told the district court that "Centennial" "provides" the shareholder services that are in fact performed by SSI is significant. The defendants viewed Centennial and the Oppenheimer companies as one entity to justify the fairness of the $18.5 million fee and now view them separately to justify entitlement to an additional $10 million. Moreover, if the $18.5 million paid to Centennial (and thereby to the broker owners of Centennial) was "fair" because the Fund did not have to pay for these additional services, then the figure might no longer be "fair" when the Fund does have to pay for them.

We realize that appellant framed his complaint to allege that the charges for administrative services violate the settlement, but we decline to hold him to that strict a reading of the complaint. His basic point, on this cause of action, is that he has been denied the benefits of the settlement. That would be true if either (a) the Fund must now pay for services that Centennial had agreed to perform under the settlement, or (b) the settlement fee is no longer fair because it was predicated on the Fund's not having to pay for certain administrative services. Both aspects of the claim are substantial and should not have been rejected on the face of the complaint.[1]

## B. Section 36(b) of the ICA

Section 36(b) of the ICA, added to the Act by the Investment Company Amendments Act of 1970, Pub.L. No. 91–547, § 20, 84 Stat. 1413, 1428–29, provides that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services" paid by the investment company or its security holders "to such investment adviser or any affiliated person of such investment adviser." The brokerage defendants, by virtue of their ownership of Centennial, are "affiliated persons" under the Act. *See* 15 U.S.C. § 80a–2(a)(3). An investment adviser violates section 36(b) when it, or an affiliated person, charges "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983).

The Fund's Plan was established pursuant to Rule 12b–1, issued by the SEC in

---

1. As indicated, appellant also claims that the 1982 proxy statement failed to reflect the true nature of Centennial's obligations under the settlement and therefore violated § 14(a) of the Securities Exchange Act of 1934 and section 20 of the ICA. In view of our disposition of the breach of settlement claim, this related claim must be reinstated as well.

1980. Under the Rule's framework, an investment company such as the Fund may act "as a distributor of securities of which it is the issuer" only pursuant to a Rule 12b–1 plan. 17 C.F.R. § 270.12b–1(b). A company acts as a distributor

> if it engages directly or indirectly in financing any activity which is primarily intended to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature.

17 C.F.R. § 270.12b–1(a)(2). The Rule further provides that a company may implement a distribution plan "only if the directors who vote to approve such implementation . . . conclude, in the exercise of reasonable business judgment and . . . their fiduciary duties under . . . sections 36(a) and (b) [of the ICA], that there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b–1(e).

Appellant offers three theories in support of his claim that implementation of the Rule 12b–1 Plan violates section 36(b). First, he repeats his contention that the advisory fee agreed to in the settlement was intended to include payment for costs incurred by the defendant brokerage firms that are now paid for under the Plan. Second, he claims that apart from a breach of the settlement the Plan's administrative fee, when added to the advisory fee paid under the settlement, is excessive. Third, he argues that the Plan violates Rule 12b–1 itself because it permits payment for services not "primarily" for the sale of new Fund shares.

■ Before turning to the individual claims, we are met by appellees' threshold argument, not addressed by the district court, that the fiduciary duty imposed by section 36(b) "has no application to payments made under a Rule 12b–1 plan," and that the dismissal of appellant's section 36(b) claim was proper "on this ground

alone." Appellees' argument is based on the mistaken notion that because Rule 12b–1 sets the conditions under which mutual funds like the Fund may pay for distribution-related expenses, Rule 12b–1 plans may not be measured against standards other than those set out in the Rule itself. Section 36(b), the argument runs, deals only with compensation for *advisory* services. But section 36(b) expressly applies to payments made to "any affiliated person" of the investment adviser, and the brokerage defendants here are concededly affiliated persons. Moreover, in proposing what ultimately became section 36(b), the SEC made clear the broad scope of that provision:

> The statutory requirement . . . would apply to *all* forms of compensation paid by all investment companies to their affiliated persons, principal underwriters, and affiliates of such persons. This would include *all* forms of compensation paid to officers, directors, advisory board members, trustees, sponsors, investment advisers, principal underwriters, and controlling persons of both externally and internally managed companies as well as persons or organizations with which such persons are affiliated. Although advisory fees are the principal form of managerial compensation in the investment company industry, externally managed companies frequently pay fees for various nonadvisory services to principal underwriters, trustees, business managers, and sponsors who, like investment advisers, are likely to have close and dominant relationships with such companies that preclude arm's-length bargaining.

Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. 144 (1966) (emphasis added; footnote omitted), hereinafter cited as Public Policy Implications. Moreover, in proposing Rule 12b–1, the SEC emphasized that the Rule was not intended "to reduce or limit in any way" the fiduciary duties imposed by section 36(b). Bearing of Distribution Expenses by Mutual Funds, In-

vestment Company Act Release No. 10,252 [1978 Transfer Binder]˙ Fed.Sec.L.Rep. (CCH) ¶ 81,603, at 80,415. A claim that payments made under Rule 12b–1 are excessive when combined with advisory fees, where both payments are made to "affiliated persons" of an investment adviser, is cognizable under section 36(b).

The district court dismissed appellant's first section 36(b) claim on the ground that it "is identical to his [already rejected] claim that the Plan violates the *Meyer I* settlement agreement." We agree that resolution of this claim turns on resolution of appellant's breach of settlement claim. In view of our reinstatement of the latter, we conclude that this aspect of his section 36(b) cause of action states a claim on which relief can be granted and therefore must be reinstated as well.

■ Appellant's second claim, that independent of a settlement violation the aggregate payment made by the Fund (advisory fee plus administrative fee) is excessive, was also prematurely dismissed. The district court relied principally on the approval of the two fees by the Fund's board of directors, despite the suggestion in *Burks v. Lasker*, 441 U.S. 471, 484, 99 S.Ct. 1831, 1840, 60 L.Ed.2d 404 (1979), that board action may not cut off shareholder suits under section 36(b). Noting section 36(b)'s provision that "approval by the board of directors ... shall be given such consideration by the court as is deemed appropriate under all the circumstances," 15 U.S.C. § 80a–35(b)(2), and emphasizing that Centennial's board is "unusually independent," the district court reached the following conclusion:

> [T]he Board's determination, combined with plaintiff's failure to allege any facts (other than those already rejected in connection with the settlement argument) to suggest that the Board did not fulfill its responsibilities under Rule 12b–1, is sufficient for the court to conclude that plaintiff's complaint should be dismissed.

In addition, the court noted that at the time the board acted, 80 other funds had adopted plans of distribution pursuant to Rule 12b–1.

To the extent that the court relied on its rejection of the breach of settlement claim, our reinstatement of that claim mandates reinstatement here as well. Moreover, under *Gartenberg, supra,* 694 F.2d at 929–30, in deciding whether a fee is so high as to constitute a breach of fiduciary duty, a court should examine all the facts surrounding a fee determination. Whether or not appellant prevails on this claim, or even reaches a trial on the merits, he has stated a claim on which relief can be granted and on which he is at least entitled to discovery.

Appellant's final section 36(b) claim, although not set out in the amended complaint, was presented in appellant's demand letter to the Fund's board of directors and was fully addressed by the district court. In the demand letter, appellant charged that

> the Plan is defective for the additional reason that it does not comply with Rule 12b–1. That Rule permits certain payments by a fund only for expenses that are 'primarily' for the sale of new fund shares, whereas the stated purpose of the Fund's Plan is to maintain old, existing accounts.

The district court disagreed, apparently deciding that the Plan's payments were "primarily intended to result in the sale of shares" within the meaning of the Rule. Emphasizing the Plan's express statement that reimbursement be for costs incurred "in rendering distribution assistance," and noting that existing shareholders "may purchase new shares," the court concluded that "[p]laintiff has failed to allege a single fact that might show that the Plan as operated violates the restrictions of Rule 12b–1."

■ We cannot be certain at this stage of the litigation whether appellant's claim concerning Rule 12b–1 provides a distinct basis on which liability under section 36(b) may be predicated. Uncertainty arises both because of some ambiguity in the terms of the Rule, which has not yet been clarified by the SEC, and some ambiguity

as to the nature of appellant's claim. Prior to promulgation of the Rule in 1980, the SEC had taken the position that a mutual fund may not act as a distributor of its own shares: "[I]t is generally improper under the [ICA] for mutual funds to bear direct or indirect expenses related to the distribution of their shares." Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11,414, [1980 Transfer binder] Fed.Sec.L.Rep. (CCH) ¶ 82,678, at 83,723; *see generally* 4 T. Frankel, *The Regulation of Money Managers* 111–19 (1978 and 1984 Supp.). The Rule reflected a sharp change in SEC policy by permitting mutual funds to bear distribution-related expenses under limited circumstances and provided certain conditions are met. The requirements of the Rule are triggered whenever a mutual fund engages in financing "any activity which is primarily intended to result in the sale of" its shares. 17 C.F.R. § 270.12b–1(a)(2). A fund doing so is "deemed to be acting as a distributor." *Id.* The Rule requires that any payments made by a fund "in connection with" a distribution must be made pursuant to a written plan. *Id.* § 270.12b–1(b). The Rule specifies various requirements concerning information to be disclosed in the plan and necessary approvals by the fund's board, shareholders, and outside directors. *Id.*

In order to be entitled to pay distribution expenses, the Fund adopted a plan, purportedly under the authority of Rule 12b–1. The Plan authorizes the Fund to make monthly "distribution assistance payments" to any securities dealer or other organization "which has rendered assistance in the distribution of" Fund shares. The purpose of the payment is stated to be reimbursement of the recipient for "its administrative and sales related costs in rendering distribution assistance." The payment is limited to the lesser of (a) two-tenths of one percent of the average net

asset value of the Fund's shares owned by the recipient or owned by customers of the recipient and held in accounts maintained by the recipient, or (b) the recipient's total cost during the month in rendering "distribution assistance." In the proxy statement seeking approval of the Plan, the Fund noted that the SEC has not determined whether dealers' expenses "in providing distribution related and administrative services to an investment company, which facilitate the sale of shares, are distribution expenses for purposes of Rule 12b–1." The proxy statement reported that the Fund's directors had therefore decided that all amounts to be paid under the Plan would be viewed as distribution expenses "regardless of whether or not certain expenses are subsequently determined not to be distribution expenses."

Appellant appears to claim that the Plan violates the Rule because the payments being made are not " 'primarily' for the sale of new fund shares" but instead "to maintain old, existing accounts." This aspect of the claim concerns the uses to which the payments are put by the recipient, or, more precisely, the uses to which the recipient has put its own money and for which it then seeks reimbursement from the Fund's "distribution assistance payments." Yet appellant also contends that the Plan violates the Rule because the payments are really being made "to pay the brokers (whose clients own over 90% of the Fund's shares) not to move their business elsewhere." This contention does not concern the uses to which the payments are put but rather the Fund's motive for making them.

■ We see nothing in the Rule or in section 36(b) that prevents a mutual fund from deciding to pay distribution expenses to dealers in order to retain the interest of those dealers in selling fund shares to their customers.[2] To the extent that appellant's

---

2. Appellees stoutly defend the Fund's right to pay brokers in order to retain the brokers' customers as shareholders of the Fund. They point out that, if the customers redeem Fund shares and purchase shares of other funds, expenses

per share would increase both because the Fund's fixed costs would be borne by a reduced number of shares and because the per share cost of the investment advisory fee is higher at lower levels of net assets. Of course, to whatev-

Rule 12b–1 claim assails the motive of the Fund, it fails to state a claim. However, to the extent that the claim challenges the uses to which the "distribution assistance payments" have been put, we decline to reject at this stage the possibility that liability under section 36(b) may be shown. It is arguable that any payments not devoted to costs of distribution are simply beyond the scope of the Rule and for that reason cannot violate it. On the other hand, since the Rule is triggered whenever a fund makes some payments that are primarily intended to result in the sale of its shares, it is also arguable that all payments purported to be made under the authority of a Rule 12b–1 plan must be devoted to distribution expenses. Even if payments under a plan are thus limited, it is not clear at this stage whether some portion of the payments made by the Fund fail to qualify as distribution payments. Appellant contends that the payments are used by the dealers to service their customers' accounts, a function appellant distinguishes from distribution of shares. The district court apparently viewed the payments as within the ambit of permissible distribution expenses simply because existing shareholders might purchase additional shares. We are not prepared to say at this point that the possibility of additional share purchases makes payments for all costs of shareholder servicing a distribution expense contemplated by the Rule. Yet we acknowledge that the Rule itself, in specifying the payments that might be made pursuant to a plan, refers not to "distribution expenses" but to any payments "in connection with" a distribution.

We are also in doubt as to appellant's theory of the legal basis for this aspect of the claim. If the claim purports to arise directly under Rule 12b–1, then a substantial question arises whether a private right of action exists for any violation of the Rule or for any violation of a plan approved pursuant to the Rule. On the

other hand, if, as appears likely, appellant claims only that liability arises under section 36(b), then the pertinent inquiry becomes whether any deviation from the Rule, or from the Plan, is so substantial as to constitute a breach of fiduciary obligations. We do not understand section 36(b) to be an enforcing mechanism for every SEC regulation or every action authorized thereunder.

Since appellant's first and second bases for claiming liability under section 36(b) suffice to withstand a motion to dismiss, we conclude, in light of all the uncertainties noted concerning the third basis, that it too should be returned for further consideration by the district court. This will afford appellant an opportunity to refine this aspect of the claim, and perhaps, subject to control of the district court, to detail the substance of the claim with at least some limited discovery. The remand will also provide an occasion for the district court to invite the SEC to submit its views on the Rule 12b–1 issues, once those issues have been clarified by refinement of appellant's claims. The SEC's views should be especially helpful in better understanding the scope and meaning of its recently adopted Rule.

## C. *Section 15(f) of the ICA*

Section 15(f) of the ICA sets the conditions under which investment advisers (or affiliated persons) may realize a profit upon the sale or transfer of their business without incurring liability to the investment company or its shareholders. It permits the receipt by an investment adviser or affiliated person of "any amount or benefit in connection with a sale of securities of, or a sale of any other interest in, such investment adviser," provided that (1) the board of directors of the investment company is, and remains, sufficiently independent and (2) "there is not imposed an unfair burden on such company as a result of such transaction." 15 U.S.C. § 80a–

er extent Rule 12b–1 is ultimately determined to limit the permissible purposes for which any fund may pay brokers pursuant to a distribution

plan, there will be no competitive disadvantage among funds.

15(f)(1). An "unfair burden" is defined to include

> any arrangement, during the two-year period after the date on which any such transaction occurs, whereby the investment adviser ... or any interested person of any such adviser ... receives or is entitled to receive any compensation directly or indirectly (i) from any person in connection with the purchase or sale of securities or other property to, from, or on behalf of such company, other than bona fide ordinary compensation as principal underwriter for such company, or (ii) from such company or its security holders for other than bona fide investment advisory or other services.

*Id.* § 80a–15(f)(2)(B).

 Section 15(f) was added to the ICA in response to this court's decision in *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir. 1971), *cert. dismissed*, 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972), in which we held that profits realized by a retiring investment adviser of a fund from the successor it had caused to be installed were recoverable by the fund. In an effort to "clarify the law in light of" *Rosenfeld*, S.Rep. No. 75, 94th Cong., 1st Sess. 71, *reprinted in* 1975 U.S.Code Cong. & Ad. News 179, 249, hereinafter cited as Senate Report, Congress enacted section 15(f) in 1975.[3] The Senate Report states:

> The bill would clarify the law in light of the 1971 decision of the Court of Appeals for the Second Circuit in *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir.1971) by removing the uncertainty surrounding the circumstances in which an investment adviser of an investment company can receive any profit upon the transfer of its business without incurring liability to the company or its shareholders.
>
> The bill would make clear that an investment adviser can make a profit on the sale of its business subject to two principal safeguards to protect the investment company and its shareholders.

(Section 25 of the bill). The first safeguard would require that 75 percent of the investment company's directors be independent for a period of three years after the investment adviser sells its business or otherwise transfers the advisory relationship. The second safeguard would provide that such a transaction must not impose any unfair burden on the investment company.

*Id.* at 71, *reprinted in* 1975 U.S.Code Cong. & Ad.News at 249.

Appellant's argument that section 15(f) was violated proceeds as follows: In the spring of 1982, shortly after the Rule 12b–1 Plan was adopted, the Oppenheimer defendants sold their controlling interest in the investment adviser (Centennial), thus implicating section 15(f); the sale was "inseparably linked" to the administrative fee imposed by the Plan in that the Plan was designed to keep the Fund's assets high, which in turn would make the investment adviser more valuable and therefore raise the sale price; the administrative fee, which was thus designed to increase the value of Centennial, imposed an "unfair burden" on the Fund, whether or not the fee is consistent with Rule 12b–1.

The district court, at a hearing in October 1982, expressed its intention to dismiss the section 15(f) claim on the theory, subsequently explained, that disposition of the breach of settlement and section 36(b) claims would "effectively render the section 15 claims nugatory." In its final Opinion and Order, the court did dismiss the section 15(f) claim stating that "since payments of distribution expenses do not impose an undue burden upon the Fund, Oppenheimer's sale of its interest in [Centennial] does not violate section 15 of the ICA."

Appellees' threshold response to this claim is that there is no implied private right of action under section 15(f). In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72

---

3. As we noted in *Newman v. Stein*, 464 F.2d 689, 695 & n. 14 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972), our decision in *Rosenfeld* occasioned considerable comment in legal periodicals before § 15(f) was enacted.

L.Ed.2d 182 (1982), the Supreme Court stated:

> In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy.

*Id.* at 378–79, 102 S.Ct. at 1839–40 (footnote omitted). The Court went on to find that since the lower courts had clearly recognized a private right of action under the Commodity Exchange Act, the failure of Congress to say anything about a private right of action in a comprehensive overhaul of the Act indicated an intent to retain that right of action. *Id.* at 381–82, 102 S.Ct. at 1840–41.

As we have already indicated, Congress enacted section 15(f) in response to this court's decision in *Rosenfeld, supra,* in which mutual fund stockholders sued the outgoing investment adviser. The unstated premise of *Rosenfeld,* and of the Congress that "clarified" it, is that a stockholder may bring such a suit. In response, appellees apparently contend that *Rosenfeld* was based on the common law prohibition against the sale of a fiduciary office for profit and that section 15 of the ICA was implicated only as a defense. But *Rosenfeld* plainly held that section 15 of the ICA was designed to incorporate that common law prohibition and impose a uniform national standard. Moreover, that Congress understood the stockholder's suit

in *Rosenfeld* to be grounded in the ICA is evidenced not only by the addition of section 15(f) but also by a statement to that effect by the amendment's co-sponsor. *See* 119 Cong.Rec. 20,028 (1973) (statement of Senator Williams) ("In [*Rosenfeld* ], the court of appeals held that the general equitable principal that a fiduciary cannot sell his office is impliedly incorporated in section 15(a) of the [ICA].").

The situation here presents a stronger case for an implied private right of action than that in *Merrill Lynch, supra,* which turned on the failure to amend the provisions under which lower courts had found an implied right of action. Here, Congress specifically addressed *Rosenfeld* and did not question the propriety of a private suit. The inference that Congress intended to preserve the private right of action, and include within it the right to sue for violations of section 15(f), is compelling. Absent evidence to the contrary, we have no reason to think that Congress, in giving the industry some relief from the rigors of *Rosenfeld,* meant to abolish the implied cause of action for shareholders that had there been recognized. Appellees have failed to cite any such evidence in section 15(f)'s legislative history. Although also designed to provide some relief for investment advisers, section 15(f) was patently enacted for the "especial benefit" of fund stockholders, *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Congress expressly conditioned the receipt of payment for the sale of an investment adviser's business on "two principal safeguards to protect the investment company and its shareholders." Senate Report, *supra,* at 71, *reprinted in* 1975 U.S.Code Cong. & Ad.News at 249. And the existence of a remedy for shareholders is plainly "consistent with the underlying purpose of the legislative scheme." *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2087. Indeed, the SEC expressly contemplated private enforcement of a provision it recommended to Congress in 1966, not enacted at the time, quite similar to the rule ultimately fashioned by the combination of

*Rosenfeld* and the addition of section 15(f). *See Public Policy Implications, supra,* at 152. We believe that "[i]n view of our construction of the intent of the Legislature there is no need for us to [further] 'trudge through all four of the factors [for deciding whether there is an implied right of action] when the dispositive question of legislative intent has been resolved.'" *Merrill Lynch, supra,* 456 U.S. at 388, 102 S.Ct. at 1844 (quoting *California v. Sierra Club,* 451 U.S. 287, 302, 101 S.Ct. 1775, 1783, 68 L.Ed.2d 101 (1981) (Rehnquist, J., concurring)).

■ Citing *Nizin v. Bright,* 478 F.Supp. 713 (D.Mass.1979), *aff'd mem.,* 618 F.2d 93 (1st Cir.1980), appellees note that since section 15(f) was enacted at least one court has rejected the reasoning of *Rosenfeld. Nizin* held that Congress had not "originally intended to prohibit the sale of an investment adviser's office for profit" by incorporating common law principles into section 15 of the Act. 478 F.Supp. at 720–21. *Nizin* did not address the question whether shareholders may sue to enforce the provision of section 15(f) that permits a sale of an investment adviser only if the sale does not impose an "unfair burden" on the fund. We hold that mutual fund stockholders do have such an implied right of action under section 15(f).

■ We now turn to consider whether appellant's section 15(f) claim was properly dismissed nonetheless. Here, too, we conclude that appellant has stated a claim that must survive a motion to dismiss. Appellees argue that because section 15(f) expressly excludes from its definition of "unfair burden" payment for "bona fide investment advisory or other services," 15 U.S.C. § 80a–15(f)(2)(B), and because the amended complaint does not explicitly allege that the Rule 12b–1 Plan involved payment for other than such bona fide services, appellant's section 15(f) claim was properly dismissed. But appellant alleges that the Plan was adopted to facilitate the sale of the controlling interest in Centennial. We do not suggest that appellant is likely to prove the truth of such an allegation, but if he is able

to do so, it at least suggests that the services paid for are in some sense not "bona fide." Whether or not appellant prevails on his breach of settlement claim or his section 36(b) claim, he has at least stated a claim under section 15(f) upon which relief can be granted.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring:

Although I would have preferred to defer to Judge Sofaer's interpretation of the settlement agreement, I can appreciate my colleagues' unwillingness to decide the issue of the agreement's scope on a motion addressed to the complaint.

However, if the settlement agreement was not intended to cover administrative services, something which Judge Sofaer is in the best position to know, I am not prepared to open the door to harassing discovery by the plaintiff on the question whether the fees provided for in the settlement agreement have remained "fair."

With this reservation, I concur.