Pollack & Kaminsky, New York City, for defendants; Daniel A. Pollack, of counsel.

**Richard MEYER, as custodian for Pamela Meyer, Plaintiff,**

v.

**OPPENHEIMER MANAGEMENT CORP., Oppenheimer Asset Management Corp., Oppenheimer & Co., Oppenheimer Holdings, Inc., A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., J.C. Bradford & Co., Bateman Eichler, Hill & Richards, Inc., Centennial Capital Corp., and Daily Cash Accumulation Funds, Inc., Defendants.**

**No. 82 Civ. 2120 (RWS).**

United States District Court,
S.D. New York.

June 13, 1989.

### OPINION

SWEET, District Judge.

After a bench trial and upon the findings of fact and conclusions of law set forth below, judgment will be entered dismissing the complaint of plaintiff Richard Meyer, as custodian for Pamela Meyer ("Meyer"), against defendants Oppenheimer Management Corp., Oppenheimer Asset Management Corp., Oppenheimer & Co., Oppenheimer Holdings, Inc. (collectively "Oppenheimer"), A.G. Edwards & Sons, Inc. ("Edwards"), Thomson McKinnon Securities, Inc. ("Thomson McKinnon"), J.C. Bradford & Co. ("Bradford"), Bateman Eichler, Hill & Richards, Inc. ("Hill Richards") (collectively the "Brokers"), Centennial Capital Corp. ("Centennial"), and Daily Cash Accumulation Fund, Inc. (the "Fund") with costs.

### The Parties

Meyer is an investor in the Fund. Centennial is the investment adviser to the

Fund, which had some $5 billion in assets at the time Meyer commenced this action. Defendants Edwards, Thomson McKinnon, Bradford, and Hill Richards (the Brokers) have a 70% ownership interest in Centennial, and the clients of Thomson McKinnon and Edwards accounted for 90% of the assets in the Fund.

*Prior Proceedings*

In an opinion of July 5, 1988, *Meyer v. Oppenheimer Management Corp.*, 691 F.Supp. 669, 680–81 (S.D.N.Y.1988), Meyer's complaint was dismissed, including his claim that the defendants had violated § 36(b) of the Investment Company Act of 1940. The complexity and difficulty of the issues presented is evidenced by the prior opinions of this court, the Honorable Abraham D. Sofaer, then sitting as a United States District Court Judge for the Southern District of New York, and the Court of Appeals for the Second Circuit, all of which are described in the decisions reported. Familiarity with those opinions is assumed.

What was overlooked in the July 5 opinion was that counsel had stipulated to reserve the remanded § 36(b) claim from the resolution of the bench trial conducted on January 21 and 22, 1988. When this reservation was pointed out, an amended opinion was filed on July 15, 1988 which stated:

> [I]n light of the parties' stipulation that the issue of fairness under section 36(b) of the Investment Company Act be reserved for later resolution, the portion of the Opinion relating to § 36(b) is dicta.

Based on these events, Meyer appropriately moved for disqualification, as well as for discovery, and that motion was denied as to disqualification by an opinion of January 31, 1989. The defendants' cross-motion for summary judgment was denied at the same time.

Presumably the last trial has been held, that which was completed on March 31, 1989, and with respect to which final submission was completed on April 19, 1989.

*The Issue*

The one issue reserved by the parties for later disposition after the January 1988 bench trial was: whether 12b–1 payments, when added to the advisory fee payments, constitute excessive compensation in breach of § 36(b) of the Investment Company Act of 1940? The court had already found as follows:

> (1) "The advisory fee payments provided for under the Settlement Order are concededly fair in and of themselves...." (691 F.Supp. at 679).

> (2) "The 12b–1 payments were ... a matter of economic survival and fair in light of the objectives of the settlement." (691 F.Supp. at 680).

*The Facts*

No facts were adduced at trial to modify any of the factual findings set forth in the opinion of July 5, 1988, which therefore are incorporated here without repetition.

Advisory fee revenues to Centennial and the 12b–1 payments made to the Brokers, when aggregated, totalled $16,515,000 in 1984; $12,401,000 in 1985; $14,988,000 in 1986; $15,075,000 in 1987. The costs to Centennial and to the Brokers of their advisory and distribution services to the Fund, when aggregated, totalled $14,605,000 in 1984; $10,045,000 in 1985; $11,788,000 in 1986; and $11,582,000 in 1987.

Aggregating the advisory fees paid to Centennial and the 12b–1 payments made to the Brokers, and setting off against them the costs pertaining to these two different activities, the overall profitability to Centennial and the Brokers of their services to the Fund pre-tax were: 11.6% in 1984; 19% in 1985; 21.4% in 1986; and 23.2% in 1987, with an overall profitability during the period of 17.2%.

The cost of services rendered by the Brokers under the 12b–1 Plan was derived from their annual certification in connection with the Plan to the board of the Fund setting forth their distribution costs. This certification forms the basis for the 12b–1 payments and as to 1983 were audited by Deloitte Haskins & Sells, the independent auditor for the Fund. Their audit opined as follows:

> We have examined the accompanying Schedule of Reimbursable Sales–Related Expenses in Connection with the Distri-

bution of Fund Shares of daily Cash Accumulation Fund, Inc. (DCAF) for the thirteen months ended December 31, 1983. Our examination was made in accordance with generally accepted auditing standards and, accordingly, included such tests of the accounting records and the method of allocation between DCAF —related activities and other activities of each security dealer for sales-related expenses and such other auditing procedures as we considered necessary in the circumstances.

\*    \*    \*    \*    \*    \*

In our opinion, except for the exclusion of sales-related general corporate overhead costs [of the Brokers] referred to in the preceding paragraph [which would have made the brokers' costs even higher], the aforementioned schedule presents fairly the reimbursable sales-related expenses in connection with the distribution of fund shares of Daily Cash Accumulation Fund, Inc. for the thirteen months ended December 31, 1983.

The methodology for allocating these costs, approved by the accountants as set forth, was derived in part from an allocation made by the Treasurer of the Fund upon visiting two of the 240 offices of the Brokers. Though the depth of the survey was challenged by Meyer no substantive attack was made on the methodology or the results of the method used.

Meyer also testified without contradiction that the profitability to Centennial and the Brokers of providing the services was higher than the profitability of broker-dealers which ranged from 7.3, 39.3, and 39.1 in the years in question, the ten largest banks having a mean effective fee rate of .346. Centennial's April 30, 1987 balance sheet shows shareholders' equity of $1,058,893. Using that or similar amounts for prior years, the return on assets range from 1,000% to 1,900%.

However, a return on assets or investment analysis adds little to the determination because a money market fund management company has no substantial net worth, is not capital intensive, and its activities differ from other types of financial services companies which provide services other than the management of money market funds from exclusive business.

Donoghue's Money Fund Report is universally accepted in the money market field as an accurate source for comparative data. According to Donoghue's ranking, the Fund was in or very near the top third of all money market funds with comparable objectives in each of 1985, 1986, 1987, and 1988. Its performance ranking in 1985 was 29 of 73; in 1986; it was 26 of 73; in 1987, it was 27 of 75; and in 1988, it was 25 of 75. The expense ratio of the Fund on an operating basis was 58.6 basis points (*i.e.*, 58.6 cents per $100 of assets managed), higher than some funds reported in Donoghue but lower than others. Aggregating not only the operating expenses (*i.e.* that component paid to Centennial) and 12b–1 fees (*i.e.* that component paid to the brokers), and utilizing a comparison with twenty top funds reviewed by Meyer, the Fund had an expense ratio of 76 basis points (*i.e.* 76 cents per $100 of assets managed).[1] This was higher than all eighteen of the funds in Meyer's sample and lower than the Delaware Cash Reserve and Fidelity Cash Reserves.

*Conclusions of Law*

Section 36(b) of the Investment Company Act of 1940 provides that:

> the investment adviser ... shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a–35(b). The statute specifically states that in an action brought under this section, "plaintiff shall have the bur-

---

**1.** The 90 basis-point total expense ratio for 1985 was aberrational, since, in that year, Thomson

McKinnon withdrew $2 billion from the Fund.

den of proving a breach of fiduciary duty." *Id.*

What is at issue here is the fiduciary duty of Centennial and the affiliated Brokers in light of the investment advisory fees charged by Centennial and the 12b-1 payments made to the Brokers, each of which has been found to be appropriate by the prior opinions of Judge Sofaer and this court. Both payments, having been found to be fair separately, and both serving different purposes, aggregation is not a necessary or appropriate consideration, particularly here where the 12b-1 payments have been established to be less than the services rendered.

However, other well respected courts have reached a contrary conclusion, the Honorable John Walker, for example in *Krinsk v. Fund Asset Management, Inc.,* 715 F.Supp. 472, 497 [1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,812, at 98, 914 (S.D.N.Y. June 27, 1988). In order to seek to write an end to this seven year old litigation, it is also appropriate to conclude that Meyer has failed to establish a breach of duty, even on an aggregated basis. *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923 (2d Cir. 1982), *cert. denied,* 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983) is the standard to which this court repaired in its earlier opinion, as have others. *See, e.g., Krinsk,* 715 F.Supp. at 497, Fed.Sec.L.Rep. at 98, 914; *Schuyt v. Rowe Price Prime Reserve Fund, Inc.,* 663 F.Supp. 962 (S.D.N.Y.), *aff'd,* 835 F.2d 45 (2nd Cir.1987). Fortunately here the facts are elementary as compared to other 36(b) cases.

In *Gartenberg,* the Second Circuit set the test as follows:

> To be guilty of a violation of Section 36(b), ... the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

694 F.2d at 928. Here Meyer has failed to establish that the amounts could not have been the result of the arms-length bargaining which has been shown here to have occurred and as to which, at least with respect to the investment advisory fee, Meyer participated, albeit at an earlier stage.

The profitability of the advisory services and distribution services for each of the years 1983, 1984, 1985, 1986, and 1987 ranged between 11.6% and 23.2% pre-tax, less than those approved by the Honorable Robert J. Ward and the Second Circuit in *Schuyt* (77% pre-tax) and the Honorable Milton Pollack and the Second Circuit in *Gartenberg* (38.4% post-tax, 69.2% pre-tax).

These conclusions are fortified in light of the purposes of the section. Section 36(b) "is not intended to authorize a court to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees." S.Rep. No. 91–184, 91st Cong., 2d Sess., at 4897, 4902–03 (1970); *see also Gartenberg,* 694 F.2d at 933 ("the trustees have the primary responsibility under the Act"). "[The] investment advisor is entitled to make a profit. Nothing in [Section 36(b)] is intended to imply otherwise or to suggest that a 'cost-plus' type of contract would be required. [Section 36(b)] is not intended to introduce general concepts of rate regulation as applied to public utilities." S.Rep. No. 91–184 at 4902–03; *see also Gartenberg,* 694 F.2d at 931.

*Conclusion*

Based on the facts and conclusions thus reached, the complaint will be dismissed and judgment entered for the defendants with costs upon notice.

It is so ordered.