Richard MEYER, as custodian for
Pamela Meyer,
Plaintiff–Appellant,

v.

OPPENHEIMER MANAGEMENT COR-PORATION, Oppenheimer Asset Management Corporation, Oppenheimer & Co., Oppenheimer Holdings, Inc., A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., Bateman Eichler, Hill, Richards, Inc., J.C. Bradford & Co., Centennial Capital Corp., and Daily Cash Accumulation Fund, Inc., Defendants–Appellees.

No. 475, Docket 89–7685.

United States Court of Appeals,
Second Circuit.

Argued Dec. 4, 1989.

Decided Feb. 1, 1990.

Mordecai Rosenfeld, New York City, for Plaintiff–Appellant.

Daniel A. Pollack, Pollack & Kaminsky, New York City (Nancy E. Barton, Weil, Gotshal & Manges, New York, New York, of counsel for Oppenheimer & Co.; Rendle Myer and Allan B. Adams, Hamilton, Myer, Swanson & Faatz, Denver, Colo.; David M. Butowsky, Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, of counsel for Daily Cash Accumulation Fund, Inc.), for Defendants–Appellees.

Before NEWMAN and WINTER, Circuit Judges, and TENNEY,* District Judge.

* The Honorable Charles H. Tenney, District Judge, United States District Court for the Southern District of New York, sitting by designation.

1. Oppenheimer & Co. (now named Odyssey Partners) owned almost all the outstanding

WINTER, Circuit Judge:

This case involves a challenge to a money market mutual fund distribution plan on the grounds, inter alia, that it violates several provisions of the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. (1988) ("the 1940 Act" or "the Act"). The plan was adopted under Rule 12b–1, 17 C.F.R. § 270.12b–1 (1989), promulgated in 1980 by the Securities and Exchange Commission. Plaintiff-appellant Richard Meyer contends that the directors and shareholders should have been informed of preliminary negotiations concerning the sale by one of the owners of its interest in the investment adviser to the fund. Meyer also claims that the distribution plan constituted an unfair burden imposed by the sale of the investment adviser under Section 15(f) of the 1940 Act, that the advisory and distribution fees are unfair under Section 36(b) of the Act, and that the plan violates the stipulation of settlement in a previous lawsuit. We disagree and affirm.

## BACKGROUND

Defendant Daily Cash Accumulation Fund, Inc. ("the Fund"), is a money market mutual fund regulated by the 1940 Act, and Pamela Meyer, for whom Richard Meyer brought suit as custodian (collectively "Meyer"), is a shareholder in the Fund. At all pertinent times, the Fund's investment adviser was defendant Centennial Capital Corporation ("Centennial"). The defendants Oppenheimer & Co. and its subsidiaries (collectively "Oppenheimer")[1] owned over half of the voting shares and about 30 percent of the total equity of Centennial. The other 70 percent of Centennial's equity was owned by four stockbroker entities, A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., Bateman Eichler, Hill, Richards, Inc., and J.C. Bradford & Co. (collectively "the Brokers").

shares of Oppenheimer Holdings, Inc., which owned almost all the shares of Oppenheimer Management Corporation, which in turn owned almost all of Oppenheimer Asset Management Corporation. All four entities, among others, were named as defendants and now appeal.

Since beginning operations in 1978, the Fund has served primarily as a vehicle for the Brokers to offer safe, liquid investments to their customers. The Brokers and their customers thus own over 90 percent of the outstanding shares of the Fund. Centennial, in exchange for a fee based on the Fund's total net assets, has provided investment advisory services to the Fund, including general management and supervision of the Fund's investment portfolio. The Brokers have promoted the sale of Fund shares and have served as the distribution link between their customers and the Fund.

Promulgated in 1980, Rule 12b–1 permits an open-end investment company to use fund assets to cover sale and distribution expenses pursuant to a written plan approved by a majority of the fund's board of directors, including a majority of the disinterested directors, and a majority of the fund's outstanding voting shares. *See* 17 C.F.R. § 270.12b–1(b). Prior to this Rule, brokers had to bear these expenses themselves.

In the fall of 1981, two of the Brokers, A.G. Edwards & Sons, Inc. ("Edwards") and Thomson McKinnon Securities, Inc. ("McKinnon"), informed Centennial that several other funds had offered them payments under the new Rule 12b–1 to reimburse the distribution costs resulting from ownership of money market fund shares by their customers. Edwards and McKinnon also indicated that they were considering withdrawing their customers from the Fund unless it adopted a similar Rule 12b–1 distribution plan. Shortly thereafter, Centennial recommended to the directors of the Fund that they consider adopting a 12b–1 plan.

In February 1982, the directors of the Fund decided to propose to the shareholders a 12b–1 plan providing for payments to the Brokers and others of distribution expenses up to 0.20 percent of the net assets of the Fund. On March 25, the directors of the Fund issued a proxy statement concerning the 12b–1 plan, and the shareholders approved the plan at the annual meeting on April 27. After issuance of the proxy statement but before the shareholders' meeting, Meyer instituted the present action.

Meanwhile, without the knowledge of either the Centennial directors or the Fund directors, Oppenheimer & Co. decided to sell several of Oppenheimer's interests, including its share in Centennial. On February 26, 1982, Oppenheimer & Co. retained Lazard Freres to assist in such a sale, and, shortly thereafter, Oppenheimer began negotiations with the British firm Mercantile House Holdings and its subsidiary Mercantile House (collectively "Mercantile"). On May 31, 1982, Oppenheimer and Mercantile entered into an agreement by which Mercantile paid $162 million in exchange for the Oppenheimer holdings, including its interest in Centennial. The agreement was publicly announced on June 1. The directors of the Fund first learned of the proposed sale of Oppenheimer's interest in Centennial to Mercantile around the time of the June 1 public announcement. None of the Fund's independent directors had knowledge of the proposed Oppenheimer sale, therefore, when they approved the 12b–1 plan in February 1982.

On June 7, 1982, pursuant to Section 15(f) of the 1940 Act, 15 U.S.C. § 80a–15(f), the Fund's board of directors approved a new investment advisory agreement between the Fund and Centennial to reflect the change in ownership of Centennial. As required by Section 15(f), the board found that the sale to Mercantile would not impose an unfair burden on the Fund. On June 21, the board issued a proxy statement describing Oppenheimer's sale of its interest in Centennial and the new advisory agreement, and on July 2 Meyer amended his complaint to seek to enjoin the sale or to require in the alternative that the profits of the sale accrue to the Fund and not to Oppenheimer. On July 27, the board of the Fund considered Meyer's claims and concluded that they were baseless. The shareholders approved the new agreement on July 29, 1982.

The parties to the present appeal have been involved in litigation for many years. Meyer filed a shareholder derivative suit

against most of the defendants in 1980, charging that the management fee was excessive and therefore violative of Section 36(b) of the 1940 Act. *See Meyer v. Oppenheimer Management Corp.*, 609 F.Supp. 380 (D.C.N.Y.1984) (*"Meyer I"*). *Meyer I* was settled in 1981, and the parties agreed in a settlement stipulation to a reduction in the advisory fee with a promise not to raise it without court approval for five years.

The instant action is a shareholder derivative suit by Meyer alleging that the distribution plan proposed in the 12b–1 proxy statement violated the *Meyer I* stipulation of settlement and that the advisory and distribution fees were excessive. The district court dismissed the complaint but we reversed and remanded. *See Meyer v. Oppenheimer Management Corp.*, 609 F.Supp. 380 (S.D.N.Y.1984) (Sofaer, J.), *rev'd,* 764 F.2d 76 (2d Cir.1985) (*"Meyer II"*).

After a trial on remand, the district court held that the proxy statements regarding the 12b–1 plan and the sale were not materially misleading, *see Meyer v. Oppenheimer Management Corp.*, 707 F.Supp. 1394, 1406–09 (S.D.N.Y.1988) (corrected version; originally published at 691 F.Supp. 669), and that Oppenheimer had no affirmative obligation to inform the Fund's directors of their plans to sell its interest in Centennial, *see* 707 F.Supp. at 1408–09. The court further held that the sale did not impose an unfair burden on the Fund in violation of Section 15(f) of the Act, *see id.* at 1406, and that the 12b–1 plan did not violate the stipulation of settlement in *Meyer I* because that settlement dealt only with advisory fees and not with distribution or administrative fees, which were provided without charge by Centennial for the stipulated five years, *see id.* at 1402–05.

The district court also held that the fees did not violate Section 36(b) of the Act. *See id.* at 1405–06. Shortly thereafter, however, it was discovered that the parties had previously stipulated that the Section 36(b) issue would be reserved for later resolution. Consequently, the district court filed an amendment and memorandum

opinion dated July 15, 1988, in which it stated that, "in light of the parties' stipulation that the issue of fairness under section 36(b) of the Investment Company Act be reserved for later resolution, the portion of the opinion relating to § 36(b) is dicta." *Id.* at 1405 n. 1. An amended judgment, dated July 20, 1988, was entered on July 22, 1988. Then, in an opinion dated June 13, 1989, the district court held that the 12b–1 and advisory fee payments were not excessive in violation of Section 36(b) of the Act, *Meyer v. Oppenheimer Management Corp.*, 715 F.Supp. 574 (S.D.N.Y.1989), and final judgment dismissing the complaint was entered on June 23, 1989. Meyer now appeals from both judgments. We affirm in an opinion that, if ever cited, is probably fated to be known as *"Meyer III."*

## DISCUSSION

■ We turn first to Meyer's argument that the Fund directors and the shareholders should have been informed of the potential Oppenheimer sale of its interest in Centennial before they approved the 12b–1 plan. In particular, Meyer claims that failure of Oppenheimer to inform the Fund's directors of the sale and the omission of information about that sale from the proxy statement are material non-disclosures that invalidate the 12b–1 plan.

Rule 20a–1, promulgated under the 1940 Act, 17 C.F.R. § 270.20a–1, makes Section 14(a) and related provisions of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78*ll* (1988), applicable to proxy statements issued under the 1940 Act. Moreover, Rule 12b–1(d), also promulgated under the 1940 Act, states that

[T]he directors of [an investment advisory] company *shall* have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to [a 12b–1 distribution plan] *shall* have a duty to furnish, *such information as may reasonably be necessary to an informed determination* of whether such plan should be implemented or continued; ... the directors *should*

consider and give appropriate weight to all pertinent factors....

17 C.F.R. § 270.12b–1(d) (emphasis added).

If the potential sale was material to consideration of the adoption of a 12b–1 plan, then Oppenheimer should have informed the Fund's directors about the sale, and the proxy statement should have included pertinent information. *Cf. Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726 (2d Cir. 1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988). However, the sale of Oppenheimer's interest in Centennial was irrelevant so far as approval of the 12b–1 plan was concerned. The district court found that the plan was "proposed to meet the competition and to counter the intention of the Brokers who accounted for 90% of the Fund's assets to leave the Fund." 707 F.Supp. at 1407. The record amply supports this finding. Approval of such a plan had become a matter of sheer economic necessity as a result of the promulgation of Rule 12b–1. A drastic and rapid reduction of the Fund's asset value by withdrawals would have forced the investment adviser to make financially damaging decisions and would have raised costs to the individual shareholders. Meyer may or may not be correct in his assertion that shareholders in a money market mutual fund are indifferent to asset size, but it cannot be denied that an enormous and rapid shrinkage in asset size is potentially very damaging. The Fund might, for example, be forced to dispose of assets prematurely or to make other decisions reducing the financial return in order to meet redemption calls. Lower total assets would also result in a higher effective advisory charge to remaining shareholders because of the economies of scale of fund management. In short, adoption of the 12b–1 plan was essential to the financial well-being of the Fund.

The potential sale of Oppenheimer's interest in Centennial was thus irrelevant to the shareholders' and directors' decisions to adopt the 12b–1 plan. It is true, as Meyer argues, that Oppenheimer's interest in Centennial would have been worth less if the 12b–1 plan were not adopted because the loss of virtually all of the Fund's assets would necessarily reduce the advisory fees. The fact that Oppenheimer might also have suffered from the Fund's loss of assets, however, would in no way affect the consideration of the merits of such a plan by the shareholders and directors because that plan was independently essential to the Fund's well-being whether or not the sale of Centennial facilitated its adoption.[2]

■ For similar reasons, we reject the contention that the sale of Centennial imposed an unfair burden on the Fund in violation of Section 15(f) of the 1940 Act. Congress enacted Section 15(f) in 1975 to limit the impact of our decision in *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir.1971), *cert. dismissed*, 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972), which held that a fund could recover the profits realized by a former investment adviser from the transfer of its business to its successor. *See* S.Rep. No. 75, 94th Cong., 1st Sess. 71, *reprinted in* 1975 U.S.Code Cong. & Admin.News 179, 249. In Section 15(f), Congress provided a means by which investment advisers might earn a profit upon the sale of the fund to another adviser, subject to two safeguards.

The first safeguard, which is not pertinent to this appeal, is a requirement that 75 percent of the adviser's directors be independent for three years after the transaction. *See* 15 U.S.C. § 80a–15(f)(1)(A). The second safeguard, which is very much at issue, requires that

there is not imposed an unfair burden on such company as a result of such trans-

---

**2.** In fact, although it is not pertinent given our disposition of this case, the record would support a finding that, given the size of the entire Oppenheimer/Mercantile transaction, Centennial's role in the transaction was inconsequential. An Oppenheimer partner testified that the sale by Oppenheimer of its 30 percent share of Cen-

tennial was of "minuscule" importance to the transaction. Moreover, Mercantile never sought, and Oppenheimer never gave, a guarantee of the Fund's asset level. Mercantile thus appears to have been indifferent to the risk of a sudden reduction of Fund assets.

action or any express or implied terms, conditions, or understandings applicable thereto.

15 U.S.C. § 80a–15(f)(1)(B). Section 15(f) also provides that

an unfair burden ... includes any arrangement, during the two-year period after the date on which any such transaction occurs, whereby the investment adviser ... receives or is entitled to receive any compensation directly or indirectly ... for other than bona fide investment advisory or other services.

15 U.S.C. § 80a–15(f)(2)(B). Meyer argues that the 12b–1 plan in this case constitutes just such an "arrangement" under Section 15(f).

Section 15(f) states that the alleged unfair burden must be "a result of" the sale. To succeed, therefore, Meyer must demonstrate that the 12b–1 plan was adopted "as a result of" the Oppenheimer–Mercantile transaction. As discussed above, that showing cannot be made in the instant case. Adoption of the 12b–1 plan by the Fund's directors and shareholders was a matter of economic necessity. The Fund directors approved the 12b–1 plan in February 1982 in ignorance of Oppenheimer's plans to sell its interest in Centennial and were reacting solely to the risk that the Brokers would withdraw from the Fund. This risk was, as stated, completely independent of the proposed sale of Oppenheimer's interest in Centennial. The plan was thus in no way "a result of" that sale.

■ We now turn to the question whether the advisory fees and the 12b–1 fees were excessive under Section 36(b) of the Act. We reiterate that the relevant judgment on appeal is the judgment entered on June 23, 1989, entered pursuant to the opinion dated June 13. In that opinion, the district court held that aggregation of the fees was not necessary and that the individual fees were not excessive. 715 F.Supp. at 577. We agree.

Section 36(b) of the Act imposes a fiduciary duty on investment advisers and "affiliated persons" regarding "the receipt of compensation for services, or of payments of a material nature." 15 U.S.C. § 80a–35(b). An advisory fee violates Section 36(b) if it "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923, 928 (2d Cir.1982), *cert. denied,* 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983).

In *Meyer II,* we stated that "[a] claim that payments made under Rule 12b–1 are excessive when combined with advisory fees, where both payments are made to 'affiliated persons' of an investment adviser, is cognizable under section 36(b)." 764 F.2d at 83. This statement stands only for the proposition that the costs of 12b–1 plans involving such affiliates as well as advisory fees are subject to review under Section 36(b). Were such review not available, investment advisers might be able to extract additional compensation for advisory services by excessive distributions under a 12b–1 plan. The statement does not, however, stand for the additional proposition that 12b–1 payments to an adviser's affiliates are to be aggregated with advisory fees to determine the merits of a Section 36(b) claim. The two kinds of payments are for entirely different services, namely advice on the one hand and sales and distribution on the other. If the fee for each service viewed separately is not excessive in relation to the service rendered, then the sum of the two is also permissible.

In the instant case, the district court found that neither payment was excessive. In its June 15, 1989, opinion, it incorporated the factual findings of its earlier opinion that no evidence existed to show that the amounts paid to Centennial were "atypical or excessive," 707 F.Supp. at 1405. *See* 715 F.Supp. at 575 (adopting prior factual findings). It further found that the 12b–1 payments were "a matter of economic survival and fair in light of the objectives of the settlement." 707 F.Supp. at 1404. In its June 15, 1989, opinion, the district court amplified its findings with profit and cost figures drawn from testimony credited by the court. *See* 715 F.Supp. at 575–76. Although Meyer challenges the figures, the

district court found them reliable, a finding that was not clearly erroneous.

█ Finally, we reject Meyer's claim that the 12b–1 plan violates the stipulation of settlement in *Meyer I.* Meyer argues that the settlement stipulation was contingent on Centennial's continued absorption of all administrative costs in connection with the Fund. The 12b–1 plan, his argument continues, shifted such costs from Centennial to the Fund and thereby impermissibly altered the terms of the stipulation. Although we noted in *Meyer II* that the 12b–1 plan would violate the settlement if "either (a) the Fund must now pay for services that Centennial had agreed to perform under the settlement, or (b) the settlement fee is no longer fair because it was predicated on the Fund's not having to pay for certain administrative services," 764 F.2d at 81, the findings of the district court on remand demonstrate that neither condition exists. The settlement stipulation involved only investment advisory fees, not administrative costs. Because the 12b–1 plan involves only distribution costs, it does not encompass payments for services Centennial had agreed to perform under the stipulation. It is true that the parties did refer to certain administrative expenses during the settlement negotiations. These were home-office administrative costs, however, and there is thus no overlap between the administrative costs on which the stipulation was arguably based and those reimbursed under the 12b–1 plan. Finally, the costs mentioned were in fact borne by Centennial during the five-year period stipulated by the settlement. *See* 707 F.Supp. at 1404. Consequently, the 12b–1 plan is consistent with the settlement in *Meyer I.*

Affirmed.