Richard MEYER, as custodian for Pamela MEYER, Plaintiff,

v.

OPPENHEIMER MANAGEMENT CORP., Oppenheimer Asset Management Corp., Oppenheimer & Co., Oppenheimer Holdings, Inc., A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., J.C. Bradford & Co., Bateman Eichler, Hill Richards, Inc., Centennial Capital Corp., and Daily Cash Accumulation Fund, Inc., Defendants.*

No. 82 Civ. 2120 (RWS).

United States District Court, S.D. New York.

July 5, 1988.

As Amended July 12 and July 15, 1988.

* Editors Note: This opinion was originally published at 691 F.Supp. 669. It is published here as corrected.

Mordecai Rosenfeld, P.C. (Mordecai Rosenfeld, of counsel), New York City, for plaintiff.

Pollack & Kaminsky (Daniel A. Pollack, Susan Y. Chin, of counsel), New York City, for defendants except .Oppenheimer & Co. and Daily Cash Accum. Fund.

Hamilton, Myer, Swanson, Faatz & Clark (Rendle Myer, Allan B. Adams, of counsel), Denver, Colo., Gordon Hurwitz Butowsky Weitzen Shalov & Wein (David M. Butowsky, of counsel), New York City, for Daily Cash Accumulation Fund, Inc.

Weil Gotshal & Manges, New York City (Nancy E. Barton, of counsel), New York City, for defendant Oppenheimer & Co.

## OPINION

SWEET, District Judge.

This action, initiated by plaintiff Richard Meyer ("Meyer") in 1982, as custodian for Pamela Meyer, a shareholder of the Daily Cash Accumulation Fund, Inc. ("the Fund") against the Fund and nine other defendants was the subject of a bench trial on March 11, 1988. Upon the testimony, exhibits and

arguments submitted, the following findings and conclusions are reached upon which judgment will be entered dismissing the complaint with costs granted in favor of the defendants.

The issues presented for resolution are complex, turning upon the procedural history of this action, the effect of proxy statements issued by the Fund to its shareholders on March 25 and June 21, 1982 and upon the effect of § 15 of the Investment Company Act, 15 U.S.C. § 80a–15 on the transactions at issue. The resolution of these issues will be ordered hopefully by consideration of the parties, the prior proceedings, the facts, which are not substantially disputed even though the implication of the facts are hotly contested, and finally the issues to be resolved.

*The Parties*

Meyer has sued the defendants derivatively as a shareholder of the Fund. The Fund is registered pursuant to the Investment Company Act of 1940 (the "Act") as a no-load, diversified, open-end investment company. It is a so-called "money market fund" with assets of $5.6 billion at the time this action was commenced.

Defendant Oppenheimer & Co. ("Oppenheimer", now named Odyssey Partners), owned defendant Oppenheimer Holdings, Inc. ("Holdings"), which in turn owned 82% of the stock of Oppenheimer Management Corporation ("Management"), which in turn owned Oppenheimer Asset Management Corporation ("Asset") (collectively the "Oppenheimer defendants").

The Oppenheimer defendants owned, at all relevant times prior to spring 1982, more than 50% of the voting stock of defendant Centennial Capital Corporation ("Centennial") and approximately 30% of its equity stock. Centennial is and was at all relevant times the investment adviser to the Fund and rendered its services to the Fund pursuant to investment advisory contracts, as required by the Act. The Fund constituted roughly 65% of the assets managed by Centennial.

Defendants A.G. Edwards & Sons, Inc. ("Edwards"), Thomson McKinnon Securities, Inc. ("Thomson McKinnon"), Bateman

Eichler, Hill, Richards, Inc. ("Bateman Eichler"), and J.C. Bradford & Co. ("Bradford") (collectively the "Brokers") each owned an interest in Centennial at all relevant times. In the aggregate the Brokers owned approximately 70% of Centennial's equity interest.

The Fund began operations in 1978. It has primarily served as a vehicle for the brokerage defendants and other securities dealers to offer their customers liquid, money market investments. During the relevant period, 91% to 96% of the Fund's shares were held by the Brokers and their customers in administered accounts.

Centennial provided investment advisory services to the Fund for an investment advisory fee. The Investment Advisory Agreement between Centennial and the Fund specifies the investment advisory services provided and the fee schedule for providing them.

The investment advisory services provided by Centennial consisted of general management and supervision of the Fund's investment portfolio, including investment advice and information, supervision of transactions of securities in the Fund's portfolio and research and investigations related to the Fund's investment policies and general business trends. The investment advisory fee schedule is based on a percentage of the total net assets of the Fund under management. As the assets under management increase, there are "fee-breaks," i.e., the percentage fee decreases.

The Brokers promoted the sale of Fund shares and provided certain services to the Fund's shareholders who are also customers of the brokers. These services are rendered in connection with the distribution of Fund shares and include preparing and processing new Fund account applications, preparing and transmitting to Shareholder Services, Inc. ("SSI") the Fund's transfer and shareholder services agent computer processable data of all Fund transactions in their customers' administered accounts, writing orders and making confirmations for the purchases and redemptions of Fund

shares for customers, providing monthly dividend statements in the broker's own account statement mailed to their customers, and providing prospecti, answering questions and generally serving as primary liaison between their customers and the Fund.

The services of the brokerage defendants are performed at their home offices and at multiple sales offices throughout the country. At the home office, the brokerage defendants performed administrative and sales-related services; at the sales offices, the brokerage defendants, through the brokers, were engaged in selling and marketing Fund shares.

*Prior Proceedings*

Plaintiff brought a prior lawsuit in this court, *Richard Meyer as custodian for Pamela Meyer v. Oppenheimer Management Corporation, et al.,* 609 F.Supp. 380 (1984) (*"Meyer I"*) on the Fund's behalf, alleging that the advisory fee paid by the Fund to Centennial was excessive and in violation of section 36(b) of the Act. The advisory fee then charged was a flat ½ of 1% of the Fund's net assets. *Meyer I* was settled by a stipulation of settlement dated June 16, 1981, pursuant to which a new advisory fee was agreed to. The new fee was scaled down as the Fund's assets increased. The settlement was approved by the Honorable Abraham D. Sofaer, then the United States District Judge to whom the action was assigned, after a hearing, by a final order and judgment entered on August 7, 1981. Among other provisions, the settlement in paragraphs 3 and 4 precluded any increase in the investment advisory fee or diminution of services (without court approval) for a period of five years. *Meyer I* was thereby concluded.

At the hearing before the District Court, seeking approval of the stipulation of settlement, Meyer's counsel submitted an affidavit that stated (among other things):

13. The management fee is, we note, not only for portfolio advice, but includes the very substantial costs of keeping all shareholder accounts current (reflecting all transactions) sending monthly statements, and responding to all shareholder inquiries. It is estimated that those administrative costs actually run between $2–$3 million per year (See deposition of James C. Swain, Exhibit B. at p. 85).

We should note that those costs are borne, not by the Fund, but by the brokerage firms that own the Adviser (A.G. Edwards & Sons and Thomson McKinnon originally; now, includes two other firms Bateman Eichler Sutro of San Francisco and J.C. Bradford of Nashville, Tennessee). Customers of those four firms represent between 90 and 95% of the Fund's shareholders (Deposition of Swain, Exhibit B., at p. 22). Pl.Exh. 2(g).

Defendants, in their memorandum in support of the proposed settlement, stated:

The services provided by Centennial pursuant to its advisory agreement with the Fund are similar to the services provided by the advisers of comparable mutual funds. Not only are some of the services provided in greater depth than those provided by other advisers, but Centennial also provides a number of services to the Fund not normally provided by investment advisers. Chief among these services are the enormous shareholder servicing and transfer agency operations performed at cost by SSI. In addition, defendants Edwards and Thomson, whose customers represent approximately 80% of the Fund's beneficial shareholders, administer their own customers' accounts at a total savings to the Fund of between $2 million and $3 million per year. (Swain Dep. at 18–22). Brokerage firms such as Edwards and Thomson also save the Fund "in excess of probably $50,000 a month in postage alone" by incorporating the Fund's monthly dividend statements in the account statements mailed to their own customers who own shares in the Fund (Swain Dep. at 28).

The Investment Advisory Agreement required Centennial to provide sales-related services to the Fund, including:

4.(b) The preparation of prospectuses, registration statements and amendments thereto as required by federal, state and other laws or by the rules and regula-

tions of any duly authorized commission or administrative body;

4.(c) The preparation of purchase agreements, confirmation forms, certificates or other papers in connection with the issuance of shares or certificates of the Fund.

In 1981 and early 1982 consideration was given to the adoption of a plan of distribution pursuant to Rule 12b–1. 12b–1 payments are payments made out of the assets of a fund to those who sell shares of the fund. Such payments, when made pursuant to a plan of distribution recommended by the directors of the fund and adopted by the shareholders of the fund, are permitted under Rule 12b–1 of the Securities and Exchange Commission ("SEC"), which became effective on October 28, 1980. A proxy statement relating to the proposed 12b–1 plan (the "Plan") was issued on March 25, 1982 ("the March Proxy Statement") in connection with the Fund's annual meeting of April 27, 1982.

On April 2, 1982, Meyer instituted this action, *"Meyer II"*, alleging that (1) the Plan violated the terms of the settlement of *Meyer I* and (2) the March Proxy Statement was misleading in failing to disclose that the Plan violated the settlement in *Meyer I.*

On May 31, 1982, Oppenheimer entered into an agreement to sell all of its businesses that dealt with the public to Mercantile House Holdings and its subsidiary Mercantile House (collectively "Mercantile") of London, England. These businesses included securities brokerage counselling and the mutual fund interests which included its downstream interest in Centennial, the investment adviser to the Fund. A proxy statement dated June 21, 1982 (the "June Proxy Statement") was issued by the Fund to its shareholders in connection with a special meeting of shareholders scheduled for July 29, 1982 to reapprove the investment advisory contract between the Fund and Centennial in view of the sale to Mercantile.

Meyer, in July 1982, amended his complaint to assert further claims, (a) alleging that the June Proxy Statement of the Fund was misleading in that it failed to disclose that the sale of Oppenheimer interest in Centennial and the Plan were "inseparably linked," and (b) the sale by Oppenheimer & Co. of its downstream interest in Centennial worked an "unfair burden" on the shareholders of the Fund.

Upon the defendants' motion to dismiss the amended complaint and plaintiff's motion to enforce the settlement, the Honorable Abraham D. Sofaer dismissed the amended complaint for failure to state a claim and no further action was taken with respect to the settlement. His eleven-page opinion, filed October 21, 1984, was reported at 609 F.Supp. 380, and the dismissal of the complaint was appealed. The Court of Appeals reversed the District Court and remanded the action in an opinion decided May 30, 1985, 764 F.2d 76. The mandate issued on the same day and discovery was conducted. The Court of Appeals suggested that the District Court, on remand, might wish to invite the SEC to participate in the trial "on the 12b–1 issues." This court did so by letter dated December 23, 1987, and the SEC declined the invitation by letter dated January 15, 1988.

A bench trial was conducted on January 21 and 22, 1988. Final argument and submissions were made on March 11, 1988.

*The Facts*

The relationship between the parties has been described above and is adopted as a finding. As a result of discovery, Meyer knew, at the time the *Meyer I* settlement agreement was presented to the court for approval that the brokerage defendants had been performing certain services for their customers, who were also Fund shareholders, at their own expense, voluntarily, and without agreement with or compensation from the Fund and that the Brokers incurred substantial expenses in providing these services connected with sales of Fund shares and that Centennial was not required to provide distribution services to the Fund under the investment advisory agreement. *Meyer I* was settled by a stipulation of settlement dated June 16, 1981, pursuant to which a new advisory fee was agreed to which scaled down the fee as the Fund's assets increased. The settlement

was approved, after a hearing, by a final order and judgment dated and entered on August 7, 1981 (the "Settlement Order").

Rule 12b-1 of the SEC became effective on October 28, 1980 and for the first time allowed mutual funds to finance sales and distribution expenses with fund assets under a written plan approved by a majority of the Fund's outstanding shares, and by a majority of the Fund's board. The majority has to include a majority of the Fund's disinterested directors. A 12b-1 Plan is subject to annual review and approval by the board and its disinterested directors. In fulfilling their duties the directors are to consider all pertinent factors.

In the fall of 1981, Robert Prindiville ("Prindiville") of Thomson McKinnon and Jack Bolin ("Bolin") of A.G. Edwards approached James Swain ("Swain"), the chief executive officer of Centennial and advised him that they had both been approached by several other large fund groups and had been solicited to pull their brokerage customers out of daily cash accumulation fund and place them in money market funds managed by those other groups. Prindiville and Bolin told Swain that the other fund groups (including Dreyfus, Federated and Sentinel) had offered them 12b-1 payments to reimburse them for the substantial costs they were incurring in distributing money market fund shares to their brokerage customers. Prindiville and Bolin told Swain, in substance, that if The Fund did not adopt a plan of distribution pursuant to Rule 12b-1, they would be forced to consider withdrawal of their brokerage customers' money from the Fund, i.e., moving their brokerage customers' money to a money market fund which would reimburse them for their distribution costs. Since the customers of Thomson McKinnon and A.G. Edwards, for all practical purposes, constituted over 90% of daily cash accumulation fund shares between them, Swain was concerned.

In November 1981 after the *Meyer I* settlement, the Fund's board began to consider for the first time a study of whether competitive conditions in the mutual fund industry indicated that the Fund should adopt a 12b-1 plan.

After considering the matter, the directors of Centennial decided to recommend to the directors of the Fund that they consider a 12b-1 Plan. The directors of the Fund, after studying the matter with outside special counsel, decided that the Fund needed to have a 12b-1 Plan or its assets would be lured away and the Fund would be non-competitive and lose its asset base.

The Fund board determined on February 25, 1982 to prepare a 12b-1 plan and submit it to the Fund shareholders at the April 27, 1982 meeting. As a consequence, the March Proxy Statement was issued on March 25. It was proposed to pay the recipients under the Plan which included the Brokers for distribution expenses up to a maximum of .20 of 1% of the Fund's net assets: The March Proxy Statement described the services to be performed under the investment advisory contract as follows:

> The Agreements required the Manager, at its expense, to provide the Fund with adequate office space, facilities, and equipment as well as assistance in the preparation and filing of specified reports, proxy materials and registration statements for continuous public sale of shares of the Fund.

Swain and Prindiville's testimony as to initiation of the Plan and its operation was consistent, credible and unimpeached.

Unbeknownst to the Centennial directors, Leon Levy ("Levy") and Jack Nash ("Nash"), both partners of Oppenheimer had met with Felix Rohatyn ("Rohatyn") of Lazard Freres several days prior to February 26, 1982 to discuss with him the sale of Oppenheimer & Co.'s businesses, including its interest in Centennial. On that date Oppenheimer retained Lazard Freres to assist and advise in the sale of the Oppenheimer interests involving the public.

Nash and Levy, the controlling partners of Oppenheimer, concluded that their holdings might well attract a foreign investor seeking a toe hold in the American market and that a sale would permit them to redirect their activities. A number of British

firms were suggested including Mercantile. A trip to London was undertaken at the end of February. Michael Stoddard ("Stoddard") introduced Nash and Levy to John Barkshire ("Barkshire"), chairman of Mercantile, discussions were held, documents exchanged, and over the Memorial Day weekend, the transaction foundered, recovered and was then made known to the remaining Oppenheimer partners. The purchase price which included the Oppenheimer interest in Centennial was $162 million and was not allocated as between the various Oppenheimer interests being purchased. Nash recalled no discussion with Mercantile relating to the Fund advisory fee charged by Centennial. Mercantile did not receive an asset guarantee or an assurance against a depletion of the Fund's assets as part of the Oppenheimer transaction. Mercantile was not informed of, did not know about, and did not analyze the implications of the Fund's 12b–1 plan during the negotiations with Oppenheimer.

On May 30, 1982 Mercantile and Oppenheimer signed a stock purchase agreement dated as of May 31, 1982 under which Mercantile agreed to pay $162 million to acquire Oppenheimer's public businesses, including its interest in Centennial. The transaction was announced to the public on June 1, 1982. Their agreement provided that Fund approval be obtained by the necessary number of funds with the necessary level of assets determined as of December 31, 1981. Nash's testimony as to the Mercantile transaction was credible and unimpeached.

The Fund's board first learned of the proposed sale to Mercantile at or about the time it was publicly announced, i.e., well after the Board's consideration and approval of a 12b–1 plan was completed. The Fund's independent directors all testified that at the time they approved the Fund's 12b–1 plan in February, 1982 they had no knowledge of the proposed Mercantile transaction.

In June 1982, Centennial and Mercantile requested that the Fund's board approve a new investment advisory agreement between the Fund and the Adviser, containing the same terms and conditions as the then current agreement, and call a shareholders' meeting for that purpose. The Fund's approval of a new investment advisory agreement was required under the Investment Company Act of 1940 because of the change of effective control of the Adviser resulting from the Mercantile transaction. Mercantile represented to the Fund that it planned to operate the Adviser as a separate subsidiary retaining its present management, officers and employees without material change in operating conditions. Mercantile further represented that it would use its best efforts to insure that no unfair burden would be imposed on the Fund as a result of the transaction. Mercantile also advised that it had no present intention of requesting the Fund's board to increase the investment advisory fee. Mercantile submitted financial information and information on the background and experience of its principal personnel to the Fund board.

On June 7, 1982 the Fund's board approved the new Investment Advisory Agreement (the "Agreement") as in the best interests of the Fund shareholders. The board found that approval of the new agreement would not impose any "unfair burden" on the Fund and on June 21 issued the June Proxy Statement. The board called a special shareholders' meeting on July 29, 1982 to approve the new Investment Advisory Agreement.

The June proxy statement described section 15(f) of the Act as follows:

Section 15(f) of the Act provides that when a change in the control of an investment adviser occurs, the investment adviser or any of its affiliated persons may receive any amount or benefit in connection therewith as long as two conditions are satisfied. First, an "unfair burden" must not be imposed on the investment company as a result of the transaction relating to the change of control, or any express or implied terms, conditions or understandings applicable thereto. The term "unfair burden," as defined in the Act, includes any arrangement during the two-year period after

the transaction whereby the investment adviser (or predecessor or successor adviser), or any interested person of any such adviser, receives or is entitled to receive any compensation, directly or indirectly, from the investment company or its security holders (other than fees for bona fide investment advisory services) or from any person in connection with the purchase or sale of securities or other property to, from or on behalf of the investment company (other than fees for bona fide principal underwriting services).

At the special shareholders' meeting called for the purpose, the Agreement was approved.

On July 2, 1982 Meyer filed his amended complaint in *Meyer II* seeking to enjoin the Mercantile transaction or alternatively requiring that the profits therefrom be paid to the Fund. On July 27, 1982 the board considered Meyer's allegations in the amended complaint of a link between the Mercantile transaction and the Fund's 12b–1 plan and concluded the allegations had no basis in fact. On July 29, 1982 the Fund's shareholders approved the new Investment Advisory Agreement.

After the board received Meyer's demand letter it investigated whether there was any link between the Mercantile transaction and the 12b–1 Plan by interviewing the personnel of Oppenheimer who were involved in the Mercantile transaction. The board was informed that there were no discussions between Mercantile and Oppenheimer concerning the Fund's 12b–1 plan; (b) the Fund's 12b–1 plan was not taken into consideration in the process of negotiating the selling price or to increase the value of Oppenheimer's public businesses; and (c) the final purchase price and consideration received by Oppenheimer was not increased because of the Fund's 12b–1 plan.

The Fund's board also investigated whether there was any link between the two largest brokerage defendants (A.G. Edwards and Thomson McKinnon) and the Mercantile transaction. Principals of the brokerage defendants informed the Fund's board that: (a) they learned of the Mercantile transaction at the same time the story was released to the press and (b) that there were no understandings of any kind between the brokerage defendants and Mercantile or Oppenheimer in connection with the Mercantile transaction.

For the fifteen months ended April 23, 1983, Centennial received management and investment advisory fees of $23,488,356 (out of total income of $23,906,976), and realized a pre-tax income of $19,921,874. Such profit was therefore 85% of the advisory fee. For the fiscal year ended April 30, 1984, Centennial received management and investment advisory fees of $13,979,393 (out of total income of $14,160,516), and realized a pre-tax income of $12,387,283. Such profit was therefore 89% of the advisory fee. For the fiscal year ended April 30, 1985, Centennial received management and investment advisory fees of $11,968,526 (out of total income of $12,147,209), and realized pre-tax income of $10,696,445. Such profit was therefore 89% of the advisory fee.

The Fund paid $7.5 million in 12b–1 payments versus actual expenses incurred by the Brokers at their sales offices of $12.4 million for the 13 months ending December 31, 1983. The Brokers' sales office expenses exceeded the Fund's 12b–1 payments throughout the five years that the Settlement Order was in effect. None of these payments were for reimbursement of home office administrative expenses.

When this lawsuit was filed (April 2, 1982) the Fund's assets were approximately $5.6 billion. At that level of assets, the Plan would cost the Fund approximately $11.2 million a year and the investment advisory fee would be approximately $18.5 million a year. Prior to the adoption of the Plan, certain of the services that were to be provided pursuant to that plan had been provided by the Brokerage Defendants at no cost to the Fund or its shareholders.

The Fund comprised approximately 65% of the total assets managed by Centennial. The other funds under Centennial management adopted 12b–1 distribution plans at the same time as did the Fund.

*The Issues Presented*

The amended complaint, the proposed amended pretrial order of the plaintiff and the evidence presented at trial raise four questions:

Did the Plan violate the settlement agreement in *Meyer I?*

Did the March Proxy Statement violate the proxy rules in failing to disclose that the Plan violated the settlement in *Meyer I?*

Did the June Proxy Statement seeking approval of the Agreement and the transfer of Oppenheimer's interest to Mercantile, violate the proxy rules in failing to disclose the alleged link between the Plan and the Mercantile transaction?

Did the sale by Oppenheimer of its interest in Centennial impose an "unfair burden" on the Fund so as to remove the transaction from the "safe harbor" provisions of § 15(f) of the Investment Company Act?

*Conclusions of Law*

**I.** *The 12b–1 Plan Did Not Violate the Settlement Order of Meyer I*

The Plan called for certain payments to be made by the Fund to the Brokers as found above, for services rendered in their sales offices in connection with the selling and administration of the entry of their customers into participation in the money market account operated by the Fund. It is without dispute that these expenses were paid by the Brokers prior to the Plan and by the Fund after the adoption of the Plan. The settlement order of *Meyer I,* of course, related to the investment fee being charged the Fund by Centennial, and was approved in light of the facts then obtaining. Although the fees paid to Centennial by the Fund as such are in literal accord with the settlement order, it is Meyer's contention that in fact the settlement order has been violated because the Fund now pays distribution expense to the Brokers who have an ownership interest in Centennial, a payment not considered nor contemplated at the time of settlement.

When the issue was presented to him, Judge Sofaer reached a conclusion contrary to Meyer's contentions, stating:

The *Meyer I* stipulation provides that "all claims asserted or which might have been asserted on the basis of any and all of the matters and transactions alleged by the complaint and the amended and supplementary complaint herein be dismissed with prejudice on the merits and that judgment be entered in favor of all defendants, upon the following terms and conditions." Stipulation at 5. Two provisions of the stipulation are relevant to the question raised in *Meyer II.* The first condition provides that:

From and after the Effective Date of this Stipulation, as hereinafter defined, and for the period hereinafter specified, Centennial will perform and offer to continue to perform all of the investment advisory services specified or required by the terms of the Advisory Agreement currently in effect between Centennial and the Fund, for a management fee to be computed in the manner contemplated by the current Advisory Agreement as a percentage of the average daily net asset value of the Fund based on the following Schedule....

Stipulation at 5. The fourth condition provides that:

Nothing herein contained shall be deemed to provide or imply that, except in respect to the maximum scale of management fees as provided in the Revised Management Fee Rate Schedule, the terms of the advisory Agreement presently or hereafter in effect between the Fund and Centennial may not be varied, modified or amended provided that no such variance, modification or amendment shall reduce the categories of service or expense guaranty undertaken by Centennial pursuant to the terms of the current Advisory Agreement.

*Id.* at 7.

Two things about the language of the stipulation, which allowed judgment to be entered in favor of *all* the defendants, must be noted. First, the only defendant

whose duties are spelled out in the agreement is Centennial. None of the services performed by either the Oppenheimer or the brokerage defendants is mentioned. Second, the stipulation refers explicitly to Centennial's duties under the Investment Advisory Agreement alone.

\* \* \* \* \* \*

Plaintiff's contentions are unpersuasive for three reasons. First, when the terms of a written settlement agreement are clear and unambiguous, resort to statements outside the agreement is impermissible. Second, when read closely, neither statement supports plaintiff's argument that Centennial was ever viewed as having borne the administrative costs of the Fund. Third, even if plaintiff is correct in claiming that Centennial did bear the Fund's administrative expenses at the time of the *Meyer I* settlement, those expenses were not borne in connection with the Investment Advisory Agreement; the settlement agreement therefore did not require that Centennial and the brokerage defendants continue to bear them.

\* \* \* \* \* \*

Under the Investment Advisory Agreement, therefore, Centennial had no responsibility to perform or pay for the distribution of share funds. Any obligations it might have had in connection with distribution were contained in a wholly separate agreement—the General Distribution Agreement between the Fund and THE Management Group, dated December 3, 1979. (This agreement is appended to defendants' first motion to dismiss as Exhibit 6.) Like the Investment Advisory Agreement, this contract was between the Fund and the adviser alone; the brokerage firms and the Oppenheimer corporations were neither parties to the contract nor parties to the contract nor mentioned in it. Centennial neither undertook to perform its current distribution obligations nor promises to perform new ones when it entered into the *Meyer I* settlement. The *Meyer I* stipulation's repeated references to one agreement and the duties of one of the defendants cannot be read to incorporate the second agreement or impose duties on the other defendants. Plaintiff therefore cannot seek to void the Fund's 12b–1 Plan on the grounds that it violates the settlement in *Meyer I.*

Upon appeal in the course of its reversal, the Court of Appeals noted that dismissal of a complaint is a drastic step and then stated:

As appellees emphasize, Judge Sofaer presided over the settlement hearing and approved the settlement in *Meyer I;* he is therefore in a particularly good position to interpret the agreement's terms. Nevertheless, we are persuaded by appellant's contention that ... Dismissal for failure to state a claim was not warranted.

\* \* \* \* \* \*

Moreover, if the $18.5 million paid to Centennial (and thereby to the broker owners of Centennial) was "fair" because the Fund did not have to pay for these additional services, then the figure might no longer be "fair" when the Fund does have to pay for them.

We realize that appellant framed his complaint to allege that the charges for administrative services violate the settlement, but we decline to hold him to that strict a reading of the complaint. His basic point, on this cause of action, is that he had been denied the benefits of the settlement. That would be true if either (a) the Fund must now pay for services that Centennial had agreed to perform under the settlement, or (b) the settlement fee is no longer fair because it was predicated on the Fund's not having to pay for certain administrative services. Both aspects of the claim are substantial and should not have been rejected on the face of the complaint.

▇ The stipulation of settlement in *Meyer I* altered the advisory fee rates paid by the Fund to Centennial for rendering investment advisory services. The Plan in no way directly altered that adjustment. Centennial performed no more or less services under the Plan and no change in its compensation resulted from the Plan. Un-

der the Plan, the payments by the Fund to the brokers provided partial reimbursement (actual distribution costs, but only up to a maximum of 20 basis points) for distribution services, *i.e.*, for selling the shares of the Fund to the public.

In the settlement hearings in *Meyer I* in 1981, the parties adverted, in their papers, to certain administrative services then being provided by the Brokers to their customers (shareholders of the Fund) free of charge. However, the Brokers did not obligate themselves under the Settlement Order to continue to provide those services free or, indeed, to provide them at all. Further, the services mentioned to Judge Sofaer were home office administrative services of the Brokers, which were provided free to the Fund throughout the five-year period covered by the Settlement Order, which has now expired. These services were described at trial as "subtransfer agency services" performed at the home office (New York City for Thomson McKinnon and St. Louis for A.G. Edwards), which involved principally the accumulation of data affecting the accounts of their customers who were Fund shareholders for transmission thereof by computer tape to the Fund's transfer agent in Denver. These services were provided free by the Brokers before the adoption of the Plan and continued to be provided free by the Brokers after the Plan.

The contemporaneous documents of the Fund, show that the brokers were reimbursed for expenses incurred at their sales offices, not for administrative expenses incurred at their home offices. No part of the partial reimbursement the Brokers received under the Plan was for services mentioned to Judge Sofaer in the *Meyer I* settlement hearings.

Therefore, there was no overlap between the services provided by Centennial under the Investment Advisory Agreement and those by the Brokers which were partially reimbursed under the Plan—nor was there even an overlap between those administrative services performed by the brokers at their home offices and referred to before Judge Sofaer (but not covered by the In-

vestment Advisory Agreement) and those distribution services being partially reimbursed under the Plan.

The advisory fee payments provided for under the Settlement Order are concededly fair in and of themselves, regardless of the additional free services being provided by the Brokers. Even if those additional free services (the so-called subtransfer agency services) are construed as having been part of the 1981 settlement bargain, Meyer got the "benefit of his bargain," since the Brokers' services mentioned to Judge Sofaer continued to be provided free during the entire five-year period covered by the stipulation of settlement.

No material evidence has been adduced upon trial that was unknown to Judge Sofaer at the time of the hearing of October 15, 1982 except the actual subsequent operation under the Plan or that compels a different conclusion than that which he reached.

II. *The Continued Fairness of the Settlement Order*

Viewing the 12b–1 payments to the brokers as a post settlement event, the payments to the brokers do not alter the fairness of the settlement with respect to the fees paid to Centennial. The Plan was adopted under changed circumstances, the adoption of an SEC Rule, and such plans had been enacted by other similarly situated funds. The Brokers were reimbursed for less than their actual distribution expenses incurred in promoting the distribution of the Fund's shares and, as found above, none of the 12b–1 payments were for the services mentioned to Judge Sofaer and all were partial reimbursement for the Brokers' sales office selling expenses.

Without the 12b–1 Plan the Brokers would have moved their customers to other funds or possibly even started their own. An outflow of assets from the Fund in the billions of dollars would have resulted in a much higher expense ratio and lower return for the remaining shareholders. The 12b–1 payments were, therefore, a matter of economic survival and fair in light of the objectives of the settlement.

It is, of course, true that the March Proxy Statement did not advise the shareholders that the advisory fee paid to Centennial under the Settlement Order already covered the expenses paid to the brokers for which the Plan sought approval, because it did not. To the extent that those payments altered the economics between the Fund and the brokers, all the material facts were disclosed and indeed constituted the Plan. The Plan for the reasons set forth did not affect Centennial's obligations or fees which in no way overlapped or were altered by the Fund's payments to some of Centennial's shareholders. No material fact was omitted, and other than its erroneous characterization of the Centennial services as overlapping the services provided by the brokers for the Fund for which they were reimbursed under the Plan, none has been claimed. The § 14(a) claim under the Securities Exchange Act of 1934 which was the subject of the footnote of the Court of Appeals turns on the same pivot as the fairness issue and has received only glancing attention by the plaintiff.

*The Plan Complied with Rule 12b–1*

Meyer has failed to establish any authorities for his contention that Rule 12b–1 bars any administrative expenses, such as the supplying of monthly account statements. He argues that expenses are fungible and that the payments under the Plan could be considered administrative. The facts as found above establish that the payments were for distribution expenses at the selling offices, and in the view of the SEC and the court, that characterization concludes Meyer's contention.

Both in fact and law Meyer has failed to prove that the Plan did not comply with the Rule.

*The Section 36(b) Claim* [1]

■ Section 36(b) of the ICA deals with the fiduciary duty of the investment adviser. As noted by the Circuit:

> An investment adviser violates section 36(b) when it, or an affiliated person, charges "a fee that is so disproportion-

ately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."

*Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed. 808 (1983). Hopefully, plaintiff's first claim of a breach of this duty—a violation of the Settlement Order —has been resolved by the considerations already set forth.

The Court of Appeals reinstated this second aspect of plaintiff's section 36(b) claim, namely that the payment of the advisory fee was excessive as a breach of fiduciary duty, independent of the alleged breach of the settlement agreement. Relying on the action of the board of directors and the information available to it, Judge Sofaer had concluded that the board's determination and the absence of any facts alleged other than the breach of the settlement agreement was a sufficient basis for dismissal.

No additional facts or testimony have been set forth since that time other than the facts of the anticipated payments. Examining all the facts available, no evidence has been presented on which it could be concluded that the investment advisor breached its fiduciary duty. There is no showing to establish that the amounts received by Centennial are atypical or excessive. Meyer's evidence, the amounts themselves, is insufficient to establish a breach of fiduciary duty.

Finally, the Court of Appeals noted that Rule 12b–1 refers not to distribution payments but to payments in connection with a distribution. The Court apparently understood Meyer's position on appeal to be that the payments under the Plan violated the Rule which should be interpreted to permit payment of expenses of distribution in the sale of new shares, but not to extend to the payments of expenses relating to the servicing of already purchased shares. The

---

**1.** The July 15, 1988 amendment provided:
   "in light of the parties' stipulation that the issue of fairness under section 36(b) of the In-

vestment Company Act be reserved for later resolution, the portion of the opinion relating to § 36(b) is dicta."

Court also expressed its uncertainty as to the nature of Meyer's claim, whether it was a private right of action or a claim that any deviation from the Plan would become grounds for an enforcement action.

Discovery and an SEC submission were suggested as instrumentalities that might clarify this as part of Meyer's 12(b) claim. Neither has succeeded to accomplish the task. No additional facts other than those relating to the allegedly omitted material in the March Proxy Statement have resulted from discovery other than the details of the Oppenheimer/Mercantile transactions described above and the actual payments made under the Plan. The SEC in responding to this court's Christmas Eve 1987 invitation stated on January 15, 1988:

> ... a factual determination by the Court that all payments made under the distribution plan in question constituted reimbursement for distribution expenses would eliminate this issue from the case.

In effect, it seems that no further evidence has been offered on this issue to disturb Judge Sofaer's conclusions, and there is no factual or legal basis on which to conclude that the payments under the Plan are not "distribution payments."

*The Section 15(f) Claim*

■ Finally the Court of Appeals remanded the action to determine whether under Meyer's section 15(f) claim the 12b–1 Plan was an unfair burden as not "bona fide" because it was adopted, not in the Fund's interest, but to enhance the assets of the Fund in order to make Centennial more attractive to sell. In other words, the purpose of the Plan according to Meyer was not to satisfy the interests of the Fund but rather those of the advisor, and the payments therefore lacked bona fides and were "unfair."

Only one factor has been adduced to support this claim, namely, the obvious conclusion that by adopting the Plan the Fund retained its assets and shareholders and Centennial's advisory fees benefitted accordingly.

However, no director of the Fund was aware of the putative transfer of a portion of Centennial's ownership, no communications between the buyer and seller of the interests in Centennial dealt with the effect of the Plan on the assets of the Fund or the advisory fee of Centennial and no separate analysis appears to have been made relative to the value of Oppenheimer's interest in Centennial. Instead of a lack of bona fides, the decision by the Fund's board was justified solely with respect to the interests of the Fund. No link has been established between the adoption of the Plan and the sale by Oppenheimer, except as to the objective effect of one upon the other. No evidence has been adduced, other than that effect, that the sale of the Oppenheimer interest in any way affected, caused or was related to the adoption of the Plan.

According to Meyer Section 15(f)(2) defines an unfair burden as quoted in the June Proxy Statement as being the receipt of compensation within two years of the transaction by an interested person (here including the Brokers because of their ownership interest in Centennial) from the Fund. The defendants have successfully met this definition by referring to Section 15(f)(1)(B) and the requirement that the "unfair burden" must result from the transaction, here the sale by Oppenheimer to Mercantile. That link has not been established by the plaintiff. The timing of the events and the evidence establish that the allegedly "unfair burden" contained in the Plan resulted from consideration prior to, and independent of, the transaction.

No basis has been established on this record for the claim that the distribution payments were an "unfair burden" to the Fund.

*The Proxy Statements Were Not Misleading*

After his successful appeal, Meyer has concentrated almost entirely on what he claims are the misleading aspects of the March and June Proxy Statements arising out of the purchase by Mercantile of the Oppenheimer interests which involved the public. The first of his proposed conclusions, both pre and post trial, dealt with the proxy statements omitted or falsely stated material facts. The remaining issues

raised by Meyer's post trial submission relates to those questions derived from the mandate, already considered, namely the 15(f) claim of unfair burden, the failure of the Plan to comply with the requirements of Rule 12(b) with respect to "distribution," the claim of "overlap" and its relationship to the services to be provided under the settlement agreement, all of which hopefully have been disposed of.

Meyer has established that the efforts to sell the Oppenheimer interests, including the interest in Centennial, had commenced prior to the issuance of the March Proxy Statement of the Fund seeking approval of the 12b–1 Plan, and it is not disputed that the March Proxy Statement made no reference to the possible sale. The record establishes that the reason for the omission was the lack of knowledge by any of the Fund officers and directors of the proposed transaction. Similarly, according to the plaintiff the June Proxy Statement violates the disclosure requirements by failing to reveal that one of the purposes of the Distribution Plan was the enhancement of the value of Centennial in connection with the sale by Oppenheimer to Mercantile of its interest in Centennial.

Meyer has cited the familiar authorities, *TSC Industries v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) and Sec. 20(a) of the Act and Sec. 20a–1 of the Regulations which make Sec. 14(a) of the Securities Exchange Act and the Rules thereunder applicable to the Investment Company Act, claiming that the most material fact of all is the benefit to be received by a fiduciary as a result of the shareholder vote. *Gerstle v. Gamble–Skogmo*, 478 F.2d 1281 (2d Cir.1973). According to Meyer, the facts here are far stronger than the facts in *Gerstle* because at bar the Oppenheimer defendants did more than just "intend" to sell their controlling interest in Centennial; here they had already implemented their intention by retaining Lazard Freres and entering into formal negotiations with Mercantile. Furthermore, the fiduciary duties owed by an investment adviser to a regulated fund's shareholders are set forth at Sec. 1 of the Act and endorsed in *Brown v. Bullock*, 294 F.2d

415 (2d Cir.1961, *en banc* per Friendly, J.); those duties are to protect "the interest of investors" against "the interests of ... investment advisers."

Meyer also relies upon the following language in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988):

> Whether merger discussions in any particular case are material therefore depends on the facts. Generally, in order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels. Without attempting to catalog all such possible factors, we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest.

Meyer also cites *Kronfeld v. Trans World Airlines*, 832 F.2d 726 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988), where the omission of a suggestion of corporate restructuring was considered a violation of the disclosure requirement. Relying on *Northway* and *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968) (*en banc*), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1554, 22 L.Ed.2d 756 (1969), the Court held that even "contingencies" could be material.

The defendants have distinguished the applicability of Meyer's authorities and rely chiefly on the factual distinctions presented here. There is no evidence here that the 12b–1 Plan was in any way motivated by the possible sale of Oppenheimer's interest in its public businesses and that at the time of the issuance of the March Proxy Statement Oppenheimer's intent to sell its interest in Centennial was material to the proposed sale. The 12b–1 Plan was proposed to meet the competition and to counter the intention of the Brokers who accounted for 90% of the Fund's assets to leave the Fund if there were no 12b–1 Plan to make distributions to their firms.

Swain, CEO of Centennial, was in Denver and was not privy to the activities or

plans of Levy and Nash and specifically did not know until mid-May 1982 that they were exploring a possible sale of Oppenheimer's public businesses. Levy and Nash were not shown to have any knowledge of the development or proposal of the Fund's 12b–1 Plan. They were in New York City and not involved in the affairs of Centennial or the Fund.

In any event, disclosure of discussions of a possible sale of Oppenheimer's public businesses, including its interest in Centennial, was not material to shareholders of the Fund until, if, and when there was such a sale agreed upon. At the time any such transaction was actually agreed upon, under the Investment Company Act the directors and shareholders of the Fund would have to approve a new investment advisory contract. In other words, for the interest of Oppenheimer in Centennial to be effectively transferred to Mercantile another proxy statement dealing with the subject for the shareholders of the Fund would be required, the June Proxy Statement.

■ Therefore, the absence of any disclosure in the March Proxy Statement concerning the discussions of Levy and Nash with Mercantile or Lazard Freres (which clearly had no influence on the Fund directors' recommendation of the 12b–1 Plan) was not a material non-disclosure. The two events were unrelated in any fashion. Indeed, there is not even any showing that the post event effects of the approval of the Plan sought by the proxy statement were considered or affected the sale to Mercantile.

Meyer also charges that the March Proxy Statement contained a false statement when it reported that the Fund's board unanimously recommended that the Plan be adopted. The claim is not that this statement was false in fact but that it was constructively false in that the unaffiliated directors had a duty to be fully informed, and it is conceded "that the Fund's outside directors were carefully kept in the dark about the steps that the Oppenheimer Defendants' [sic] had taken to sell their controlling interest in CCC [Centennial],"

(Plaintiff Post Trial Proposed Findings of Fact and Conclusions of Law, p. 30).

The plaintiff relies on the following language in *Tannenbaum v. Zeller*, 552 F.2d 402, 417–18 (2d Cir.):

> As previously mentioned, independent directors can perform their function under the Act only when they exercise informed discretion, and the responsibility for keeping the independent directors informed lies with the management, i.e., the investment adviser and interested directors. See, e.g., 15 U.S.C. Section 80a–15(c). This responsibility is particularly pressing when the matter in question is one on which the interests of the management and the mutual fund may be at odds.

*cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977).

Of course, here it was not the management of the Fund which failed to disclose the allegedly material fact. Indeed, the only person with knowledge of the possibility of a sale of an interest in the advisor, Centennial, at the time of the issuance of the March Proxy Statement, were the controlling partners of the entity thrice removed from the actual owner of the interest. There is no showing here that the possible sale of the Oppenheimer interests, including Oppenheimer Management's share of Centennial, would have been material to the shareholders of the Fund, even if such a sale would have benefitted the interested directors. No proof to that effect has been adduced in any case. Indeed, the later approval of the sale of the Centennial interest seems to establish that it was not material.

However, even for the sake of analysis, even assuming a materiality which has not been established on this record, the disclosure requirements have yet to create any affirmative obligation for an officer of a controlling entity to disclose his intentions to the directors of the corporation (the Fund) doing business with an adviser in which one of his controlled subsidiaries holds a 30% equity interest and a 50% voting interest. Whatever the responsibilities of the Fund's management were, there is

no authority which has been cited that extended those responsibilities to persons in the capacities of Levy and Nash.

*The June Proxy Statement*

■ The attack on the June Proxy Statement derives from the acceptance of the positions urged by the plaintiff with respect to the March Proxy Statement, namely, that the Plan was adopted to facilitate the sale by Oppenheimer to Mercantile of its interests, that without the Plan there would have been no sale of Centennial, that the sale price would have been affected, that there was a connection between the sale to Mercantile, and that the Plan constituted an "unfair burden" to the Fund. All these positions have been found to be without basis in fact except as to the possibility that had the Plan not been accepted, the Fund might have lost between 80 and 95% of its assets, that Centennial's fees would have been reduced and that, therefore, Mercantile might have sought to reduce the amount paid for the Oppenheimer assets. Indeed, Meyer cites Barkshire's doubt that had the Fund managed by Centennial been reduced from $8 billion to $1 billion, Mercantile would have paid the same. The unquantified post transaction speculation is the high water mark of Meyer's theory that a material fact was omitted.

This hypothesis advanced in 1988 with respect to a proxy issued in June 1982 seeking approval of a transfer of an interest in Centennial following the approval of the Plan in April 1982 does not constitute a material fact. In fact, no basis or relevant information could have been found to offer the shareholders in June of 1982 other than that which was provided. If the March Proxy Statement was not misleading, neither was the June Statement.

The purpose of the June 1982 Proxy Statement was to obtain consent of the Fund shareholders to transfer the advisory contract with Centennial (under its old owners) to Centennial (under its new owners). Since four of the five ultimate owners remained the same, and since the personnel running Centennial and servicing the Fund remained the same, the change could be considered a corporate formality. In any event, the Plan and the sale by Oppenheimer of its downstream interest in Centennial were factually unrelated events.

The British buyer neither inquired about nor cared about the Plan. Consideration of the 12b–1 Plan had begun at least three months before Nash and Levy ever considered Mercantile as a potential acquirer or even took steps to explore a sale to Mercantile. The evidence also shows that, although the directors of the Fund had recommended the Plan to the Fund shareholders to prevent a run on the assets of the Fund, Oppenheimer in March 1982 gave Mercantile no guarantee of asset levels for the Fund (or any other fund) in their transaction. Thus, Mercantile would have been compelled to close whether or not there had been a 12b–1 Plan and whether or not the assets were at $5.5 billion or any other number. This was a "normal business risk" that Mercantile knowingly and willingly undertook, according to Barkshire, the Chairman of Mercantile. He did express doubt as to whether the price paid to Oppenheimer would have been the same had the assets managed by Centennial been reduced by $\frac{7}{8}$, presumably before the sale.

In sum, the Plan and the sale by Oppenheimer of its downstream interest in Centennial were not "inseparably linked"—indeed, they were not linked by an interrelationship at all and the June 1982 Proxy Statement was not misleading in failing to disclose such linkage. The failure of the adoption of the Plan in April 1982 or the transfer of Oppenheimer's interest in June 1982 might have affected the Oppenheimer/Mercantile relationship after March 31, 1982, but no evidence has been presented to that effect.

Based on the findings and conclusions set forth above, the complaint will be dismissed with costs. Submit judgment on notice.

IT IS SO ORDERED.